# EXHIBIT B

Case 1:21-cv-01268-APM  Document 67-4  Filed 06/14/24  Page 2 of 26

Deposition of Suhag A. Shukla                    Hindu American Foundation v. Sunita Viswanath, et al.

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3                            No. 1:21-cv-01268

4    --------------------------------------x

5    HINDU AMERICAN FOUNDATION,

6                  Plaintiff

7    vs.

8    SUNITA VISWANATH; RAJU RAJAGOPAL;

9    RASHEED AHMED; JOHN PRABHUDOSS;

10   AUDREY TRUSCHKE; AND DOES 1-20,

11                  Defendants

12   --------------------------------------x

13        REMOTE DEPOSITION OF SUHAG SHUKLA

14          Monday, May 16, 2022 9:20 a.m.

15                Conducted Virtually

16

17

18

19   Reported by:

20   Janet McHugh, RMR, CRR, CLR

21   JOB NO. 12858

22

23

24

1

2                              May 16, 2022

3                              9:20 a.m.

4

5

6

7        Remote deposition of SUHAG SHUKLA,

8   conducted virtually, pursuant to Agreement before

9   Janet McHugh, a Registered Merit Reporter,

10  Certified Realtime Reporter, Certified LiveNote

11  Reporter, and a Notary Public within and for the

12  Commonwealth of Massachusetts.

13

14

15

16

17

18

19

20

21

22

23

24

Deposition of Suhag A. Shukla                    Hindu American Foundation v. Sunita Viswanath, et al.

1    REMOTE APPEARANCES:

2    Attorneys for the Plaintiff:

3    Dilan Esper, Esquire

4    HARDER LLP

5    8383 Wilshire Boulevard, Suite 526

6    Beverly Hills, California 90211

7    424.203.1600

8    desper@harderllp.com

9

10

11   Attorneys for Defendant, Rasheed Ahmed:

12   Joshua Colangelo-Bryan, Esquire

13   Daniel Goldberger, Esquire

14   Florence Neale, Esquire

15   DORSEY & WHITNEY LLP

16   51 West 52nd Street

17   New York, New York 10019

18   212.415.9234

19   colangelo.joshua@dorsey.com

20   goldberger.dan@dorsey.com

21   neale.flossie@dorsey.com

22

23   - and -

24   - Continued-

```
 1   REMOTE APPEARANCES:  (Continued)

 2   Briana Al Taqatqa, Esquire

 3   DORSEY & WHITNEY LLP

 4   50 South Sixth Street, Suite 1500

 5   Minneapolis, Minnesota 55402

 6   612.340.2600

 7   altaqatqa.briana@dorsey.com

 8

 9

10   Attorneys for Defendants Sunita Viswanath and Raju

11   Rajagopal:

12   Thomas B. Sullivan, Esquire

13   Jacquelyn N. Schell, Esquire

14   BALLARD SPAHR LLP

15   1675 Broadway, 19th Floor

16   New York, New York 10019

17   212.223.0200

18   sullivant@ballardspahr.com

19   schellj@ballardspahr.com

20

21

22   Attorneys for Defendant Audrey Truschke:

23   Eric J. Feder, Esquire

24   DAVIS WRIGHT TREMAINE LLP
```

1    REMOTE APPEARANCES:   (Continued)

2    DAVIS WRIGHT TREMAINE LLP (Continued)

3    1301 K Street NW

4    Suite 500 East

5    Washington, D.C. 20005-3317

6    202.973.4200

7    ericfeder@dwt.com

8         - and -

9    Jared Carter, Esquire

10   Cornell Law School First Amendment Clinic

11   Cornell University

12   Myron Taylor Hall

13   Ithaca, New York 14853-4901

14   207.319.6050

15   jc2537@cornell.edu

16

17

18   Attorneys for Defendant John Prabhudoss:

19   Daniel M. Sullivan, Esquire

20   Andrew W. Chang, Esquire

21   HOLWELL SHUSTER & GOLDBERG, LLP

22   425 Lexington Avenue

23   New York, New York 10017

24   646.837.5151

1    REMOTE APPERANCES:   (Continued)

2    HOLWELL SHUSTER & GOLDBERG, LLP (Continued)

3    dsullivan@hsgllp.com

4    achang@hsgllp.com

5

6

7    ALSO PRESENT:

8    Audrey Truschke

9    Rasheed Ahmed

10   David Ambrogi, Everest Technician

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    I N D E X

 2   WITNESS                    DIRECT     CROSS

 3   SUHAG SHUKLA

 4   By Mr. Colangelo-Bryan     9

 5

 6              E X H I B I T S

 7   Number          Description              Page

 8   Exhibit 1  Document Bates-stamped

 9              HAF000415 through -0418        118

10   Exhibit 2  Plaintiff Hindu American

11              Foundation's Responses to

12              Defendants' First Set of

13              Interrogatories Regarding

14              Subject Matter Jurisdiction    35

15   Exhibit 3  Document Bates-stamped

16              HAF000023 and -0024            17

17   Exhibit 4  Document Bates-stamped

18              HAF000021 and -0022            25

19   Exhibit 5  Document Bates-stamped

20              HAF000031 through -0033        28

21   Exhibit 6  Document Bates-stamped

22              HAF000053                      32

23   Exhibit 7  Document Bates-stamped

24              HAF000339 through -0340        114
```

Deposition of Suhag A. Shukla                          Hindu American Foundation v. Sunita Viswanath, et al.

```
 1              E X H I B I T S

 2   Number            Description                 Page

 3   Exhibit 8   Document Bates-stamped

 4               HAF000001 through -0003          59

 5   Exhibit 9   Document Bates-stamped

 6               HAF000005                        62

 7   Exhibit 11  Complaint for Damages            89

 8   Exhibit 12  Document Bates-stamped

 9               HAF000329 through -0332          96

10   Exhibit 14  Document Bates-stamped

11               HAF000333 through -0336          106

12   Exhibit 16  Document Bates-stamped

13               HAF000337 through -0338          110

14

15

16

17

18

19

20

21

22

23

24
```

Deposition of Suhag A. Shukla                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 9

1    P R O C E E D I N G S
2          SUHAG SHUKLA,
3  having been duly sworn, after presenting
4  identification in the form of a driver's license,
5  deposes and says as follows:
6          DIRECT EXAMINATION
7  BY MR. COLANGELO-BRYAN:
8      Q.  Good morning, Ms. Shukla.  I'm Joshua
9  Colangelo, one of the lawyers for Rasheed Ahmed.
10  I was going to ask first if you know any good
11  lawyer jokes, but we've all seen the video, so I
12  think we'll skip that one.
13      But you, yourself, have a law degree; is
14  that right?
15      A.  Yes, I do.
16      Q.  Where did you get it and when?
17      A.  University of Florida, and I started in
18  '94 and graduated in '97.
19      Q.  Are you admitted to the bar of any
20  states?
21      A.  Yes.  I'm admitted to Florida.  I was
22  previously admitted to Minnesota, but there's no
23  chance of moving back there, so I'm no longer
24  admitted there.

Page 10

1      Q.  Did you ever practice?
2      A.  Yes, I did.
3      Q.  Could you describe your practice for
4  us, please?
5      A.  Sure.  My first few years, I was a
6  homeless advocate and a public benefits law for
7  Gulfcoast Legal Services.  After that, I
8  practiced immigration for about five to six years
9  and specialized in national interest waivers and
10  EB-1s.  And then I joined HAF staff, where I
11  don't technically practice law, but most of my
12  work intersects with the law.
13      Q.  Where is Gulfcoast Legal Services?
14      A.  In St. Petersburg, Florida.
15      Q.  Where did you practice immigration law?
16      A.  The firm was based in Gainesville.  I
17  first -- so I was working remotely.  I started in
18  Tampa, Florida, and then we moved to
19  Philadelphia.  So I continued my practice in
20  Philadelphia because immigration law is federal,
21  so it has the flexibility of working from
22  whichever state.  And then finished out in
23  Jacksonville, Florida, when we moved back to
24  Jacksonville, Florida.

Page 11

1      Q.  What was the name of the firm that you
2  did that with?
3      A.  Robert Jacobs LLC.
4      Q.  So forgive my math, for how many years
5  all together did you practice?
6      A.  Two years at Gulfcoast Legal Services,
7  and to the best of my recollection, six to seven
8  years with Robert Jacobs.
9      Q.  Have you ever taken a deposition?
10      A.  Excuse me?
11      Q.  Have you ever taken the deposition of a
12  witness?
13      A.  No, I have not.
14      Q.  Have you ever been deposed before?
15      A.  No, I have not.
16      Q.  So just a few ground rules.  Obviously,
17  the oath that you took a moment ago means that
18  your testimony today is the same as if it were in
19  court for perjury purposes.  Because truthfulness
20  is so important, please let me know if you don't
21  understand a question or if you don't hear it,
22  given that we're on Zoom and my voice is not
23  doing as well as it might otherwise.
24      Will you make sure to do that, please?

Page 12

1      A.  Yes.
2      Q.  And I guess I'll mention another thing.
3  Answers need to be verbal so that the court
4  reporter can take them down.
5      A.  Noted.
6      Q.  Okay.  So I couldn't hear if you said
7  "yes" before, which is the only --
8      A.  I did.  I said "yes."
9      Q.  And then the last thing I'll say is, as
10  Janet told us, for everyone's sake, let's try to
11  make sure that we don't talk over the end of the
12  other's sentences, which is easier to do on Zoom
13  than in person.  But it makes life particularly
14  hard if you are trying to transcribe a
15  conversation.
16      Does that sound okay?
17      A.  Yes.
18      Q.  To try and make things move
19  efficiently, if I use the acronym HAF, H-A-F, to
20  refer to the Hindu American Foundation, would
21  that be acceptable to you?
22      A.  We don't use HAF.  We use H-A-F.
23      Q.  I will endeavor to use H-A-F.  If you
24  hear me say "HAF," please know that I'm trying to

Deposition of Suhag A. Shukla                                  Hindu American Foundation v. Sunita Viswanath, et al.

Page 13

1 say H-A-F.

2    A.  Okay.

3    Q.  One other thing, I'm going to refer to

4 the statements that HAF alleges are defamatory

5 just generally as "defendants' statements."

6    Will you understand that?

7    A.  Yes.

8    Q.  So, Ms. Shukla, when did you start

9 working for HAF?

10    MR. ESPER:  Counsel, can I have just a

11 slight clarification just before we start the

12 substance here.  This is the personal part of the

13 deposition or are you doing the corporate

14 designee part first?

15    MR. COLANGELO-BRYAN:  This is the

16 individual portion.

17    MR. ESPER:  Okay.  Thank you.  Go

18 ahead.

19    A.  Okay.  I am cofounder of the Hindu

20 American Foundation, so I have been there since

21 day one.  I did not join staff until, let's see,

22 2007 or 2008.  I would have to go back and check.

23 But I've been with HAF roughly 13 years as

24 full-time staff.

Page 14

1 BY MR. COLANGELO-BRYAN:

2    Q.  When did you cofound the organization?

3    A.  In 2003.

4    Q.  Who -- was there one other cofounder?

5    A.  There were five original cofounders.

6 Well, including me, six.

7    Q.  Between the time you cofounded the

8 organization and became a staff member, did you

9 have a role with HAF?

10    A.  I did.  I was legal counsel.  And I

11 oversaw several of our legal initiatives.

12    Q.  When you say "legal initiatives," can

13 you explain what you mean?

14    A.  Sure.  We filed amicus briefs before

15 the U.S. Supreme Court in cases dealing with the

16 separation of church and state.  We were involved

17 with a lawsuit against the State Board of

18 Education of -- in California over procedural

19 irregularities in their textbook adoption

20 process.  And I can't recall what other legal

21 initiatives, but along those lines.

22    Q.  HAF was a party in that California

23 action you mentioned?

24    A.  Yes.

Page 15

1    Q.  So since you became a staff member with

2 HAF, have you held a number of different

3 positions?

4    A.  I've always been the executive

5 director.

6    Q.  I'm sorry.  Can you say that one more

7 time.  I just lost the beginning.

8    A.  Yeah.  I've always been the executive

9 director and have continued to serve as legal

10 counsel, now co-legal counsel.

11    Q.  What did you do to prepare for today's

12 deposition?

13    A.  I reviewed all of the submissions we've

14 made.  I reviewed the Complaint.  I reviewed the

15 interrogatories.  I reached out to key staff for

16 questions on the process for all of the

17 submissions, how reports were generated, and any

18 additional background information.

19    Q.  When you say you reviewed the

20 submissions that HAF has made, can you just

21 specify what type of submissions you mean?

22    A.  Yes.  I mean the reports of financials,

23 the printouts of correspondences from whether

24 it's grant makers, donors -- what else?  The

Page 16

1 e-appeals, printouts of e-appeals.  So all of the

2 submissions that we made in response to this

3 discovery process.

4    Q.  So when you say "submissions," you mean

5 the documents that were produced by HAF --

6    A.  Right.

7    Q.  -- in this case?

8    A.  Yes.

9    MR. ESPER:  Remember to let him finish

10 his question before you come in.

11    Q.  Which staff members did you talk to?

12    A.  I spoke to my managing directors.  I

13 spoke to my director of philanthropic

14 partnerships.  I spoke to or at least

15 communicated with our director of development,

16 our director of communications.  Those, to the

17 best of my recollection.

18    Q.  Did you talk to outside counsel in

19 preparation for the deposition?

20    MR. ESPER:  You can answer that "yes"

21 or "no."

22    A.  Yes.

23    Q.  How many times?

24    A.  Twice, maybe three times.

Page 17

Q.  I think you mentioned grants a moment ago.  HAF is taking the position in this case that its damages include a couple of grants that it didn't get; is that correct?

MR. ESPER:  Object as to form.

You can answer.

A.  Yes.

Q.  One of the grants that HAF is alleging it didn't receive was a $35,000 grant from the Allstate Foundation; is that correct?

MR. ESPER:  Object as to form.

A.  Yes.

Q.  Ms. Shukla, let me just ask, what are you looking at right now?

A.  I'm just pulling up the Allstate, from the -- I printed out all of the documents that we have submitted.

MR. COLANGELO-BRYAN:  So you may already be looking at it.  But, David, can we pull up Exhibit 3, please.

(Document Bates-stamped HAF000023 and -0024 marked Exhibit 3.)

BY MR. COLANGELO-BRYAN:

Q.  Ms. Shukla, do you recognize this as a

Page 18

communication from the Allstate Foundation to HAF?

MR. ESPER:  Object as to form.  I think the technical thing is they have to give her control so she can scroll down and see the entire document.

MR. COLANGELO-BRYAN:  Well, if she needs to do that, certainly we will allow that to happen.

MR. ESPER:  I think she needs to do that, because how would she know what's below the scroll of this document?  It could be something else.  I think she needs to see the entire document.

BY MR. COLANGELO-BRYAN:

Q.  Would you like to see the entire document, Ms. Shukla?

A.  Yes.

MR. COLANGELO-BRYAN:  So, David, can we do that?

THE WITNESS:  Thank you.

A.  Yes.  This is the communication from Allstate.

Q.  What is your understanding of the

Page 19

Allstate Foundation and its mission?

A.  Allstate announced a new initiative for racial equity, and we received an invitation to apply.  The invitation came through our -- one of our managing directors, who then forwarded it to our education director.  And they were looking for proposals that would promote youth empowerment.

Q.  Who at Allstate sent the invitation to the managing director?

A.  I don't recall.

Q.  Who is the managing director?

A.  Sheetal Shah.

Q.  Could you spell that, please?

A.  S-H-E-E-T-A-L, last name S-H-A-H.

Q.  Who is the managing -- excuse me, strike that.

Who is the educational director to whom the invitation was sent by the managing director?

A.  Shereen Bhalla.  Her name is at the top of this document that's on the screen.  S-H-E-R-E-E-N.  Last name B-H-A-L-L-A.

Q.  So if we look at Exhibit 3, Ms. Shukla, do you see where, in the first line, Allstate

Page 20

refers to the submission of a pre-application?

A.  Yes.

Q.  Did HAF submit a pre-application?

A.  Yes.  In response to the invitation.

Q.  Was the invitation -- so the invitation, I take it, was in writing?

A.  Yes.  I believe so.

Q.  Do you know where that document is?

A.  I think we can be -- I think our education director should have it.

Q.  Do you know if HAF gave that document to its counsel in this case?

A.  I don't recall.

MR. COLANGELO-BRYAN:  We would ask for the production of that document.

MR. ESPER:  Well, we'll have to check to make sure it's within the scope of your request.  If it is and hasn't been produced, then obviously we would produce it.  If it isn't, we'll have a discussion about that.

BY MR. COLANGELO-BRYAN:

Q.  Ms. Shukla, when did HAF submit its pre-application?

A.  The solicitation came in September.  We

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 21

1  applied somewhere shortly after that. And then,
2  as you can see, the rejection came in October.
3      Q. Was Allstate aware of the defendants'
4  statements when it rejected the pre-application?
5          MR. ESPER: Object as to form.
6      You can answer.
7      Q. You can answer.
8      A. Okay.
9          MR. ESPER: Don't speculate.
10     A. I do not know if Allstate was aware of
11 the defendants' defamatory statements.
12     Q. Did anyone at Allstate communicate to
13 HAF that Allstate was aware of the defendants'
14 statements at that time?
15         MR. ESPER: Objection. Counsel, some
16 of this is corporate designee stuff. If you
17 phrase, did they communicate with HAF.
18         MR. COLANGELO-BRYAN: Please, please.
19 Cease with the speaking objections. I haven't
20 said anything about it.
21         MR. ESPER: Counsel, I'm not going to
22 cease with anything. No. No. No. No.
23 Counsel.
24         MR. COLANGELO-BRYAN: Stop yelling.

Page 22

1          MR. ESPER: No. Listen, you need to be
2  very clear about when you're examining this
3  witness as the fount of knowledge about HAF and
4  when you're examining her personally. And when
5  you ask a question in her personal deposition
6  that says what does HAF know, I'm going to
7  instruct her not to answer unless you can be
8  reasonable about this.
9          So either be very clear that you're
10 switching to corporate designee or if you're
11 asking her personal knowledge, be very clear that
12 you're asking her personal knowledge.
13         MR. COLANGELO-BRYAN: Mr. Esper, again,
14 please stop with the speaking objections. Please
15 stop yelling.
16         MR. ESPER: I'm not. No. Don't call
17 it a speaking objection. I'm going to instruct
18 her not to answer on the grounds I just said. So
19 make your choice.
20         MR. COLANGELO-BRYAN: I am asking -- I
21 will be asking the question again since you have
22 quite inappropriately --
23         MR. ESPER: I instructed her not to
24 answer as asked. Now rephrase.

Page 23

1  BY MR. COLANGELO-BRYAN:
2      Q. Ms. Shukla, as far as you know, did
3  anyone at Allstate communicate to HAF that
4  Allstate was aware of defendants' statements when
5  it rejected HAF's pre-application?
6      A. No.
7      Q. Is it your testimony that HAF's
8  pre-application was rejected by Allstate because
9  of defendants' statements?
10         MR. ESPER: Object as to form.
11     A. It's possible that we were --
12     Q. Thank you.
13     A. -- rejected --
14     Q. So on Exhibit 3, do you see where
15 Allstate says that it's "received more than 2,000
16 compelling pre-applications making the vetting
17 process very competitive"?
18     A. Yes.
19     Q. If you know, how many pre-applications
20 received a favorable response from Allstate?
21         MR. ESPER: Object as to form.
22     A. I do not recall. I do not know.
23     Q. But your testimony is that it's
24 possible that Allstate rejected HAF's

Page 24

1  pre-application because of defendants'
2  statements?
3          MR. ESPER: Object as to form.
4      A. We submitted a strong proposal for
5  teacher professional development, programs for
6  which we have been recognized and for which we
7  have received other grants and for which we've
8  built a brand name for. So it is very possible
9  that the defendants' defamatory statements, in
10 contrast to two strong applications, if one ports
11 controversy and the other does not, could impact
12 a decision regarding a grant.
13     Q. But you don't know if that happened?
14     A. No, I do not know.
15     Q. You referred to "two strong
16 applications" a moment ago. If Allstate had
17 approved HAF's pre-application, would that have
18 guaranteed funding to HAF?
19         MR. ESPER: Object as to form.
20     A. This was a new grant opportunity. As I
21 mentioned before, we received the invitation. So
22 I do not know what their process is.
23     Q. You don't -- well, let's look at
24 Exhibit 4, please.

Deposition of Suhag A. Shukla                                      Hindu American Foundation v. Sunita Viswanath, et al.

Page 25

1    (Document Bates-stamped
2    HAF000021 and -0022 marked Exhibit 4.)
3        MR. COLANGELO-BRYAN:  David, if we
4    could scroll down to the bottom of the page.
5    Ms. Shukla -- if we could expand so we could see
6    the lower right-hand side.
7    BY MR. COLANGELO-BRYAN:
8        Q.  Ms. Shukla, do you see where this page
9    is marked HAF -21?
10       A.  Yes.
11       Q.  And that indicates that HAF produced
12   that document to defendants in this case; right?
13       A.  Yes.
14       MR. COLANGELO-BRYAN:  If we could go up
15   a little bit -- I'm sorry, David, if we could
16   scroll down to the next page.  A little bit more,
17   please.
18   BY MR. COLANGELO-BRYAN:
19       Q.  If we could look at the application
20   process, Ms. Shukla, are you able to see that
21   text?
22       A.  Yes, I am.
23       Q.  Do you see where it says,
24   "Pre-applications are required for all funding

Page 26

1    requests to confirm eligibility and identify
2    proposals that align with program requirements"?
3        A.  Yes.
4        Q.  And then if you look down three bullet
5    points, do you see where it says, "A limited
6    number of pre-application submissions will be
7    invited to submit a full application for
8    funding"?
9        A.  Yes.
10       Q.  So HAF needed to submit and have
11   approved a pre-application before it could even
12   submit an actual application; correct?
13       MR. ESPER:  Object as to form.
14       A.  Yes.
15       Q.  And Allstate informed HAF in writing
16   that it was a very competitive pre-application
17   process; right?
18       MR. ESPER:  Object as to form.
19       A.  Yes.
20       Q.  Has HAF ever submitted a full
21   application to the Allstate Foundation for any
22   funding ever?
23       A.  As I mentioned before, this was the
24   first time we were dealing with Allstate.

Page 27

1        Q.  I just would like to get a direct
2    answer to my question.  I'll ask again.
3        Has HAF ever submitted a full application to
4    the Allstate Foundation for any funding?
5        A.  No.
6        Q.  Had HAF ever submitted a
7    pre-application to Allstate for any funding
8    before the pre-application we've been talking
9    about?
10       A.  No.
11       Q.  Ms. Shukla, is HAF contending also that
12   it didn't receive a grant from the Oak Foundation
13   in the amount of $143,000?
14       A.  Yes.
15       MR. ESPER:  Object as to form.
16       MR. COLANGELO-BRYAN:  Mr. Esper, what
17   is objectionable about the form?
18       MR. ESPER:  Okay.  I'll tell you.  And
19   I'll do it straight with you.  When you say does
20   HAF contend, that's kind of asking what our legal
21   contentions are.  I don't object to the substance
22   of the question.  But I think it's better to talk
23   in terms of what this witness personally knows,
24   sees, believes, rather than the form does HAF

Page 28

1    contend.  I don't want somebody to later say,
2    well, your witness said HAF contended something
3    or didn't contend something.  You know, that's my
4    department.
5        But it's your deposition.  I'm just
6    putting the objection out there.
7    BY MR. COLANGELO-BRYAN:
8        Q.  Ms. Shukla, what is the Oak Foundation?
9        A.  The Oak Foundation is a -- it's a large
10   grant-making body that has a variety of
11   priorities that it funds.
12       MR. COLANGELO-BRYAN:  David, could we
13   pull up Exhibit 5, please.
14       (Document Bates-stamped
15   HAF000031 through -0033 marked Exhibit 5.)
16       MR. COLANGELO-BRYAN:  If you could go
17   down to the bottom of the first page so
18   Ms. Shukla can see the Bates number.
19   BY MR. COLANGELO-BRYAN:
20       Q.  Ms. Shukla, do you see that HAF
21   produced this document in this litigation?
22       A.  Yes.
23       MR. COLANGELO-BRYAN:  David, if we
24   could go back up to the top of this document.

Page 29

BY MR. COLANGELO-BRYAN:

Q.   Ms. Shukla, is this an email from the Oak Foundation rejecting an application from HAF?

A.   Yes.

Q.   Was the Oak Foundation aware of defendants' statements when it sent this email, to your knowledge?

MR. ESPER:  Object as to form.

A.   I do not know.

Q.   To your knowledge, did anyone at the Oak Foundation tell anyone at HAF that the Oak Foundation was aware of defendants' statements at that time?

A.   The Oak Foundation stated in this letter that trustees don't disclose the reasons for their decisions.

Q.   So let me ask my question again.  To your knowledge, did anyone at the Oak Foundation tell anyone at HAF that the foundation was aware of defendants' statements when this email was sent?

A.   No.

Q.   Is it your testimony that the Oak Foundation rejected HAF's application because of

Page 30

defendants' statements?

A.   It is possible.

Q.   Is it your testimony that it happened?

A.   No.

Q.   Do you see in the second paragraph of this letter -- excuse me, this email -- where it says, "Although we certainly found it interesting work, I am afraid that we are unable to provide the funds you seek.  I'd like to stress that this is not necessarily a reflection on the merits of your application, but instead the very competitive funding situation with which we are faced."

Do you see that?

A.   Yes.

Q.   Prior to the application we've been speaking about, had HAF ever submitted an application for any funding to the Oak Foundation?

A.   No.

Q.   Other than the Allstate and Oak Foundation grant processes that we've discussed, has HAF submitted any other proposal for funding since May 1st, 2021, to your knowledge?

Page 31

MR. ESPER:  Object as to form.

A.   Since May 2021?  I don't recall.  I'd have to go back through the records.

Q.   I'm sorry?  Could you say that again?

A.   I would have to check my records as -- just in terms of timeline whether we applied to anything -- I mean, there was the Allstate.  But whether there were any other grants that we applied to after May 21st.

Q.   Who at HAF would have information about that?

A.   Depending on the subject matter of the grant, it could be our director of human rights. It could be our director of education.  It could be our director of philanthropic partnerships. Or if it's a general grant, it could be the requisite staff member overseeing the particular subject area.

Q.   So all of those people have some manner of responsibility in connection with various grants and funding proposals?

A.   Yes.

Q.   Is it your understanding that HAF claims that its damages in this case include

Page 32

being expelled from the Alliance Against Genocide?

MR. ESPER:  Object as to form.

A.   Yes.

MR. COLANGELO-BRYAN:  David, could we pull up Exhibit 6, please.

(Document Bates-stamped HAF000053 marked Exhibit 6.)

MR. COLANGELO-BRYAN:  Can we show Ms. Shukla the Bates number on the lower right-hand corner.

BY MR. COLANGELO-BRYAN:

Q.   Ms. Shukla, do you see this was a document produced by HAF in this case?

A.   Yes.

MR. COLANGELO-BRYAN:  Let's go back to the top of the document.

Q.   Ms. Shukla, reading from the first paragraph of the email, do you see where it says, "Due to your organization's lawsuit against Hindus for Human Rights, the Alliance Against Genocide is expelling the Hindu American Foundation from the Alliance Against Genocide. There is no room in the Alliance for

Case 1:21-cv-01268-APM   Document 67-4   Filed 06/14/24   Page 16 of 26

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 41

1  same stance for an American law that does
2  something similar, where it identifies religious
3  groups as an organization that promotes secular
4  forms of government.  We do not believe that any
5  one religion should be favored over others.
6      Q.  Other than what you've mentioned, are
7  there policies of the government of India that
8  HAF has advocated against?
9      MR. ESPER:  Same objection.
10     A.  I can't recall at this moment.  We're
11 18 years old.
12     Q.  Are you generally aware of the
13 Citizenship Amendment Act of India?
14     A.  Yes.  That is the refugee policy that
15 I'm referring to.
16     Q.  Your testimony is that HAF advocated
17 against the Citizenship Amendment Act?
18     A.  We advocated for an improvement of the
19 Citizen Amendment Act.
20     Q.  That was public advocacy?
21     A.  There's a statement available on our
22 website that makes very clear that we believe
23 that if the Indian government, as well as the
24 American government, would not make a policy of

Page 42

1  specifying specific religious groups in any sort
2  of amnesty policy, it would be more aligned with
3  secular governance.  The American law is the
4  Lautenberg Amendment.  It's all available on the
5  website.
6      Q.  So when I asked whether it was public
7  advocacy, the answer to that is "yes"?
8      A.  Yes.
9      Q.  In the interrogatory responses we
10 looked at, HAF complains about being referred to
11 as "pro-Hindutva."
12     Why does HAF object to being described as
13 pro-Hindutva?
14     MR. ESPER:  Object as to form.
15     A.  The method by which your clients, the
16 defendants, use the term "Hindutva" is
17 derogatorily.  They use "Hindutva" in the context
18 of Hindu supremacist or Hindu nationalist, and we
19 are none of those.
20     Q.  How does HAF define "Hindutva"?
21     MR. ESPER:  Object as to form.
22     A.  We don't have a definition of Hindu
23 Hindutva.
24     Q.  Is HAF anti-Hindutva?

Page 43

1      MR. ESPER:  Object as to form.
2      A.  If we don't have a definition of
3  Hindutva, that answers the question as to whether
4  we are for or against.  We are nonpartisan.
5      Q.  Are you saying that Hindutva is a
6  partisan organization?
7      MR. ESPER:  Object as to form.  Also
8  argumentative.
9      A.  I am saying "Hindutva" has no single
10 definition, and without a single definition,
11 there's no question of being for or against
12 something.
13     Q.  Does -- strike that.
14     Did HAF ever receive funding from the
15 Alliance Against Genocide?
16     A.  No.
17     Q.  In the interrogatory responses, HAF
18 complains about being characterized as supporting
19 the current Indian government's erosion of
20 certain values.
21     Does the phrase "current Indian government"
22 refer to the Modi government?
23     A.  Yes.
24     Q.  Which values are being referred to in

Page 44

1  the sentence I just read?
2      A.  It would refer to the statement written
3  by Dr. Stanton in his rejection letter.  I'll
4  just look it up.  Erosion of those same
5  democratic values.  It's from the letter dated
6  August 9th, from Dr. Gregory Stanton.  The slight
7  change, instead of "certain" -- the letter says
8  "democratic values."
9      Q.  Ms. Shukla, I'm going to read from
10 HAF's interrogatory responses, where it refers
11 to, "false accusations reflected in the
12 Defamatory Statements that Responding Party
13 allegedly is a pro-Modi, pro-Hindutva
14 organization that supports the current Indian
15 government's erosion of certain values."
16     Is HAF saying here that it is false to
17 characterize HAF as supporting the current Indian
18 government's erosion of certain values?
19     MR. ESPER:  Object as to form.
20     A.  Is -- I'm sorry.  It sounds like a
21 double negative.  Could you repeat your question,
22 please.
23     Q.  Is HAF complaining that it is false to
24 characterize the organization as supporting the

Case 1:21-cv-01268-APM   Document 67-4   Filed 06/14/24   Page 17 of 26

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 53

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Could we go off the record?  Because I
2  don't want this to take up any time from the
3  questioning.  Please.
4       MR. COLANGELO-BRYAN:  Sure.  Let's go
5  off the record.
6       (A recess was taken.)
7       MR. FEDER:  Okay, with apologies again
8  for the interruption, our client, Audrey
9  Truschke, is off now as well.  So everyone is
10  free to go back on the record.
11       And again I would ask that as soon as
12  the part that you are provisionally designating
13  as Attorneys' Eyes Only concludes to please note
14  that on the record.
15       MR. ESPER:  I will.  I'm still learning
16  this.  And just to be clear, all attorneys -- all
17  clients or non-attorneys are off the call right
18  now; right?  Is everybody off the call that needs
19  to be off the call?  That was my point.
20       MR. SULLIVAN:  This is Tom Sullivan.
21  My clients are not on the call.
22       MR. ESPER:  Okay.  Great.
23       MR. COLANGELO-BRYAN:  Let's go back on
24  the record, please.

Page 54

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BY MR. COLANGELO-BRYAN:
2   Q.  Ms. Shukla, what Fortune 500 company is
3  being referred to in the last paragraph on
4  Page 15 of HAF's responses to defendants'
5  interrogatories?
6   A.  Can you pull up the document?  It is
7  PayPal.
8   Q.  Which employees at PayPal "requested
9  that the company" have HAF do the Hinduism 101
10  presentation?
11   A.  There is a group of employees that --
12  or at least I know of one that was working with
13  others that recommended -- I don't know who the
14  others are.  I know one who recommended that HAF
15  do a 101 cultural competency training.
16   Q.  Who is that person?
17   A.  That individual has asked not to be
18  named because they would be worried about their
19  job security.  So --
20       MR. ESPER:  You can answer.
21       MR. Ms. Shukla?
22       MR. ESPER:  You can answer.  I've
23  instructed her to answer, Counsel.
24       Go ahead.

Page 55

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   A.  His name is Milind, M-I-L-I-N-D,
2  Makana, M-A-K-W-A-N-A.
3   Q.  What is Milind's position at PayPal?
4   A.  He's an engineer.  I don't know exactly
5  his position.
6   Q.  When did Milind make the request to
7  PayPal to have HAF provide the Hinduism 101
8  presentation?
9   A.  This would have been late April or
10  maybe May of 2021.
11   Q.  Have you ever seen a document
12  reflecting that request by Milind to PayPal?
13   A.  No.  I received an email from Milind,
14  asking whether we would be available for a
15  Hinduism 101 training.
16   Q.  Did you receive any other emails or
17  written communications from him regarding the
18  possibility of HAF doing that presentation at
19  PayPal?
20   A.  We received the initial email asking
21  whether we were able to provide that competency
22  training.  I can't recall whether it was a phone
23  call or an email in which we were informed that
24  their proposal to invite HAF was rejected.

Page 56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q.  Who informed you that the proposal to
2  invite HAF was rejected?
3   A.  Mr. Makana.
4       MR. COLANGELO-BRYAN:  We ask for the
5  production of the initial email and any other
6  written communications on that subject because
7  they have not been provided to us.
8  BY MR. COLANGELO-BRYAN:
9   Q.  To whom at PayPal did --
10       MR. ESPER:  I want to state for the
11  record, Counsel, I will look into that.  And if
12  we disclose it, we will of course designate them
13  Attorneys' Eyes Only.
14       Go ahead.
15   Q.  To whom at PayPal did Milind make the
16  request to have HAF do the Hinduism 101
17  presentation?
18   A.  I'm not sure.
19   Q.  I'm sorry?
20   A.  I'm not sure.
21   Q.  Who at PayPal said that HAF "did not
22  align with the company's values"?
23   A.  I don't know exact exactly what body
24  the request was made to, but it came from

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

---

Page 57

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  decision-makers of that body.

2      Q.  Do you know who the decision-makers

3  were of this unidentified body?

4      A.  No.

5      Q.  Do you know if the unidentified

6  decision-makers from the unidentified body knew

7  of defendants' statements at the time of saying

8  HAF did not align with PayPal's values?

9          MR. ESPER:  Object as to form.

10     A.  All of this occurred after April 2nd

11 and April 8th.  So after the publication of your

12 client, the defendants' defamatory statements.

13 So it's possible that they knew about the

14 defamatory statements.

15     Q.  Do you know if they did know of the

16 defamatory statements?

17     A.  I do not know.

18     Q.  Had PayPal ever hired HAF to do a

19 Hinduism 101 presentation before October 2021?

20     A.  No.

21     Q.  Had PayPal ever hired HAF for any

22 purpose at all before October 2021?

23     A.  No.

24     Q.  Is it your sworn testimony that PayPal

---

Page 58

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  did not retain HAF in October 2021 because of

2  defendants' statements?

3          MR. ESPER:  Object as to form.

4      A.  I'm sorry.  Repeat the question.

5      Q.  Is it your sworn testimony under oath

6  here today that PayPal did not retain HAF in

7  October of 2021 because of defendants'

8  statements?

9          MR. ESPER:  Object as to form.

10     A.  It is possible that they concluded that

11 HAF does not reflect their values because of the

12 defamatory statements published by your clients,

13 the defendants.

14     Q.  You're, unfortunately, not answering

15 the specific question I am asking, which is

16 whether you are testifying here today under oath

17 that it was because of defendants' statements

18 that HAF was not retained by PayPal.

19         MR. ESPER:  Object as to form.

20     A.  I do not know, so the answer then would

21 be no.

22     Q.  Ms. Shukla, just to ask, would you care

23 for a break of a few minutes?

24     A.  No.  I'm fine.

---

Page 59

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  I'm sorry?

2      A.  I'm fine.

3          MR. COLANGELO-BRYAN:  David, please

4  show the witness Exhibit 8.

5          (Document Bates-stamped

6      HAF000001 through -0003 marked Exhibit 8.)

7          MR. COLANGELO-BRYAN:  Could we drop

8  down just a little bit to show the Bates number.

9          MR. ESPER:  Counsel, I assume you're

10 through with PayPal and Mr. Milind; right?  For

11 the moment, at least.

12         MR. COLANGELO-BRYAN:  Yes.

13         MR. ESPER:  Okay.  Then let's reset and

14 get the people back on the record.  That

15 concludes the Attorneys' Eyes Only portion.

16         MR. FEDER:  And that's fine.  I will

17 let our client know, but it is not necessary to

18 wait to resume the questioning.

19         MR. ESPER:  As long as the record is

20 clear as to what is Attorneys' Eyes Only and what

21 isn't, that's fine.

22 BY MR. COLANGELO-BRYAN:

23     Q.  Ms. Shukla, what are you looking at

24 right now?

---

Page 60

1      A.  On the screen or in my binder?

2      Q.  In your binder?

3      A.  The reduced donations HAF 00001.

4      Q.  So because this is a visually murderous

5  document, I can understand why you would want to

6  look at it in person.  Would you do me a favor

7  and just take out this document, 1 to 3, from the

8  binder, and put the rest of the binder aside?

9          (Witness complies.)

10 BY MR. COLANGELO-BRYAN:

11     Q.  So, Ms. Shukla, this document,

12 HAF -0001 through -0003 shows donors to HAF who

13 gave less in '21 -- excuse me, 2021 than 2020;

14 correct?

15     A.  Yes.

16     Q.  And there are 173 donors on this list;

17 is that right?

18     A.  Yes.

19     Q.  Is it your sworn testimony that every

20 single one of those 173 donors reduced their

21 contributions in 2021 because of defendants'

22 statements?

23         MR. ESPER:  Object as to form.

24     A.  These donors' donations were reduced

---

Page 61

after the publication of the defamatory
statements.  What the reason for reducing is, I
don't know the exact reason.

Q.   When you say you don't know the exact
reason for the reductions, is that true as to all
173 donors on the list?

A.   Yes.  It is not our practice to call
donors to ask why they have reduced or ceased
their donations.

Q.   I'm going to ask the question I posed
just a moment ago, because I'd like to get a
direct response to it, which did not happen.

Is it your sworn testimony that each one of
these 173 donors reduced their contributions in
2021 because of defendants' statements?

MR. ESPER:  Asked and answered.  Object
as to form and also object to that preamble.

Go ahead.

A.   I do not know, so no.

Q.   You said a moment ago that it is not
HAF's practice to inquire of donors with respect
to the reasons why a contribution might be
reduced.  Did I understand that correctly?

A.   Yes.

Page 62

Q.   Does HAF inquire of donors who instead
of reducing a contribution fail to make a
contribution in a given year?

A.   No, we do not.  We like to respect our
donors' privacy.  There might be a variety of
reasons as to why they have reduced or ceased
their donations.

MR. COLANGELO-BRYAN:  David, could we
pull down Exhibit 8 and put up Exhibit 9, please.

(Document Bates-stamped
HAF000005 marked Exhibit 9.)

BY MR. COLANGELO-BRYAN:

Q.   Ms. Shukla, Exhibit 9 begins with
HAF -0004.  It's another visually merciless
document.  So if you care to --

A.   Yeah.

Q.   -- pull up a hard copy, that would make
sense.

Ms. Shukla, are you looking at what has been
marked as Exhibit 9?

A.   Yes.

Q.   This document, which begins with
HAF -0004 and ends with HAF -00020 shows HAF
donors who made no contribution to HAF in 2021;

Page 63

is that correct?

A.   Yes.

Q.   Do you happen to know how many entries
there are on this document?

MR. ESPER:  Object as to form.

A.   I believe there are like 700, something
over 700.

Q.   Is it your testimony under oath today
that all 700-plus donors on this list decided not
to contribute to HAF in 2021 because of
defendants' statements?

MR. ESPER:  Object as to form.

A.   I know that they donated in the year
prior to the defendants' defamatory statements
and ceased to donate after the year of the
defamatory statements.  But I do not know the
exact reason for why an individual donor may have
ceased to donate.

Q.   Do you know the reason in some manner
that is not exact?

MR. ESPER:  Object as to form.

A.   No.

Q.   I'm going to ask the question I posed a
moment ago one more time.

Page 64

Is it your testimony that all 700-plus
donors on Exhibit 9 made no contribution to HAF
in 2021 because of defendants' statements?

MR. ESPER:  Object as to form.  Asked
and answered.

Go ahead.

A.   I don't know, so no.

Q.   You mentioned a moment ago that these
were donors who had given in 2020 and ceased to
donate after defendants' statements; correct?

A.   Yes.

Q.   If you can count down eight lines from
the top, on HAF -0004.  Do you see a donor
identified by a code that ends with 2uB7tG?

A.   Yes.

Q.   Do you know who that donor is?

A.   I do not know offhand.

Q.   Do you know if it's a person or an
entity?

A.   I do not know offhand.

Q.   So this donor gave $25,000 in 2020 and
made no contribution in 2021; correct?

A.   Correct.

Q.   But you don't know what the reasons

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 65

1 were for the donor not contributing in 2021;
2 correct?
3      A.   Correct.
4      Q.   Do you see that the donor gave $50,000
5 in 2022, after the defendants' statements were
6 made?
7      A.   Yes.
8      Q.   And that's twice as much as the donor
9 gave in 2020, before the defendants' statements?
10      MR. ESPER:  Object as to form.
11      A.   Yes.
12      Q.   So there are donors on this list who
13 gave substantial sums at a point in time after
14 defendants' statements were made; correct?
15      MR. ESPER:  Object as to form.
16      A.   Out of the 700-plus donors, yes, there
17 might be a handful who ceased to donate in 2021
18 but donated again in 2022.
19      Q.   Ms. Shukla, I really haven't said this
20 before, but I'll say it now for the sake of
21 expediency and proper form.  Please respond to
22 the question that I ask.
23      MR. ESPER:  Counsel, I object to that.
24 That was a perfectly good response.

Page 66

1      Keep doing what you're doing.
2      MR. COLANGELO-BRYAN:  Mr. Esper, you
3 don't coach your witness.
4      MR. ESPER:  I'm not coaching.  That's
5 correcting a false statement you made on the
6 record, Counsel.  She's answering your questions.
7 There's no procedure that says you have to like
8 the answers.
9 BY MR. COLANGELO-BRYAN:
10      Q.   Ms. Shukla, look at the last page of
11 this document, please, HAF -20.
12      A.   Mm-hmm.
13      Q.   Do you see that in the last two entries
14 donors are reflected who gave a dollar in 2020
15 and nothing in 2021?
16      A.   Yes.
17      Q.   Is it your testimony that those donors
18 failed to make a contribution in 2021 after
19 giving a dollar in 2020 because of defendants'
20 statements?
21      MR. ESPER:  Object as to form.
22      A.   I have two answers for that question.
23 Yes, they did not donate in the amount of
24 $648,061 that they donated in 2020 and did not

Page 67

1 donate in 2021.  As to the reason, I do not know.
2      Q.   If you look five entries from the
3 bottom on HAF -20, do you see a donor with a
4 code, the last digits of which are 2eLVrf?
5      A.   Yes.
6      Q.   Do you know who that donor is?
7      A.   I do not recall.
8      Q.   Did that donor contribute $21 in 2018,
9 $501 in 2019, and $2 in 2020?
10      A.   Yes.
11      Q.   Do you know why those differing amounts
12 were given in those years?
13      A.   I do not know.
14      Q.   Do you believe there's anyone at HAF
15 who would know or would that information not have
16 been gathered pursuant to HAF's donor policies?
17      MR. ESPER:  Object as to form.
18      You can answer.
19      A.   We would not collect that per our donor
20 policy.
21      Q.   Based on your long experience, are you
22 surprised to see a donor give different amounts
23 in different years?
24      MR. ESPER:  Object as to form.

Page 68

1      You can answer.
2      A.   Could you repeat the question, please.
3      Q.   Based on your experience, does it
4 surprise you to see any donor give different
5 amounts in different years to HAF?
6      MR. ESPER:  Same objections.
7      A.   It depends.  Some will have a
8 consistent upward trajectory and if there's a
9 sudden stop, yes, it's surprising.  Sometimes you
10 might see fluctuations like we see in this fifth
11 from the bottom donor that you highlighted.  So
12 it just depends.
13      Q.   Do you believe that the donor fifth
14 from the bottom gave HAF more money in 2019 than
15 2018 necessarily because she had a higher opinion
16 of HAF in 2019?
17      A.   It's possible.  That's a huge jump.
18      Q.   Could other reasons explain the
19 increased donation?
20      A.   Again, anything is possible there.
21      Q.   In your experience, are there a range
22 of reasons that can explain an increased donation
23 from one year to the next?
24      A.   In my experience, the primary reason

Page 69

1 that people will donate to a charity is
2 because -- especially with an advocacy
3 organization or an education organization, is
4 because they support the work that's being done.
5    Q.  My question was:  In your experience,
6 are there a range of reasons why a donor might
7 give an increased donation from one year to the
8 next?
9    A.  Yes.
10    Q.  And would the donor's resources be one
11 of those reasons?
12    A.  Sometimes.
13    Q.  Could it be a decision to focus
14 charitable giving on HAF as opposed to other
15 organizations?
16    A.  Sometimes.
17    Q.  What other reasons have you seen for an
18 individual donor to give more money in one year
19 than the prior year?
20    A.  They are pleased with the work that we
21 have done in supporting our mission of educating
22 the public about Hinduism or advocating for
23 policies that promote the well-being of all
24 people on the planet.

Page 70

1    They may be inspired by one particular --
2 they might just want to support generally the
3 work of educating the public about Hinduism.
4 They might be specific about our educational
5 efforts of improving the accuracy and balance of
6 how Hinduism is taught in public school
7 textbooks.
8    So it's a variety of reasons related to our
9 programming.
10    Q.  Are there reasons unrelated to HAF that
11 ever explain a donor's decision to give more in
12 one year than the prior year?
13    A.  Give more?  It's possible.
14    Q.  In your experience what reasons,
15 independent of HAF, are there?
16    A.  I'm not understanding this question.
17    Q.  Based on your experience, have donors
18 ever increased their donations to HAF from one
19 year to the next for reasons unrelated to HAF's
20 work but related to the donor's personal
21 circumstances?
22    A.  It's possible.
23    Q.  But you've never seen that?
24    A.  Actually, yes, there have been

Page 71

1 instances where a family member passes away and
2 we were a charity that that member supported.
3 And so when an individual passes away, the
4 surviving family member may donate in memoriam or
5 as part of a will or an estate.
6    Is that what you're asking?
7    Q.  Prior to defendants' statements, did
8 any HAF donors give different amounts year to
9 year?
10    A.  Yes.
11    Q.  Was it unusual for HAF donors to give
12 varying amounts year to year?
13    MR. ESPER:  Object as to form.
14    MR. COLANGELO-BRYAN:  We can put that
15 exhibit away, please.
16    A.  It depends.
17    Q.  Was it unusual for HAF donors to give
18 different amounts in different years?
19    MR. ESPER:  Same objection.
20    A.  Again, it depends.
21    Q.  That's really not an answer to my
22 question.  My question is:  Prior to defendants'
23 statements, was it unusual for HAF donors to
24 contribute different amounts in different years?

Page 72

1    MR. ESPER:  Object as to form.  I'll
2 say it's ambiguous as to "unusual."
3    Go ahead, though, if you understand it.
4    A.  Yes.  Yes.
5    Q.  It was unusual?  For people to give --
6    A.  Right.  It is not unusual.  It is not
7 unusual.
8    Q.  To make sure we have a clean record,
9 let me ask one more time.
10    Prior to defendants' statements, was it
11 unusual for HAF donors to contribute different
12 amounts in different years?
13    MR. ESPER:  Objection.  Ambiguous.
14    Go ahead.
15    A.  No.
16    Q.  Prior to defendants' statements, did
17 all of HAF's donors contribute to HAF every
18 single year?
19    A.  Repeat the question.
20    Q.  Prior to defendants' statements --
21    MR. COLANGELO-BRYAN:  Could we put
22 those away, please, Ms. Shukla.
23    THE WITNESS:  I'm just tidying them up.
24    Q.  Prior to defendants' statements, did

Deposition of Suhag A. Shukla          Hindu American Foundation v. Sunita Viswanath, et al.

Page 77

1 charitable priorities.

2     Q. Do you believe that when a donor who
3 has given money in the past gives nothing to HAF
4 in a certain year, that decision is based on the
5 donor's having developed a negative view of HAF?

6     A. It's possible.

7     Q. It's possible there would be other
8 reasons as well?

9     A. Yes.

10     Q. Would those be the same reasons as
11 you've mentioned a couple of times before
12 regarding resources or charitable focus?

13     A. Yes.

14     Q. Is it your understanding that HAF is
15 claiming that it has suffered damages in terms of
16 lost donations from 2022?

17       MR. ESPER: Object as to form.
18       Go ahead and state your understanding.

19     A. Yes. Thus far, yes.

20     Q. Does HAF receive donations only in the
21 first four months of each year?

22     A. No.

23     Q. I presume we can agree that it's
24 May 2022 right now?

Page 78

1     A. Yes.

2     Q. There's about seven months left in this
3 year?

4     A. Yes.

5     Q. Could any HAF donor who has not made a
6 2022 contribution yet still make a 2022
7 contribution before the end of this year?

8     A. Yes.

9     Q. Are you aware of any HAF donor who has
10 said he or she will not make a 2022 contribution
11 because of the fact of defendants' statements?

12     A. No.

13     Q. How can HAF definitively say it has
14 lost 2022 contributions from any donor given that
15 it's only May 2022?

16       MR. ESPER: Object as to form.

17     A. We know that in 2020 these donors gave
18 us a certain amount of money, $648,000. And in
19 2021, after the defamatory statements were
20 published, ceased to give.

21     Q. Well, didn't we look at a donor who, in
22 fact, gave in 2022, after not giving in 2021?

23     A. Right. I answered that question
24 already about the few exceptions of the

Page 79

1 700-and-whatever-plus donors, that there may be
2 some who did give in 2022 that did not give in
3 2021.

4     Q. I'm going to ask again the question I
5 posed a moment ago to try and get a direct
6 answer.

7     How is it possible for HAF to take the
8 position, in May 2022, that it has definitively
9 lost 2022 contributions from any donor?

10       MR. ESPER: Counsel, I object to
11 everything about that question. It's both
12 argument and you accuse the witness of not
13 answering your question.

14       But if she understands it, go ahead.

15     A. We know what losses we have to date.
16 Whether those donors that cease to give in 2021
17 will remain at a zero level, we will know by the
18 end of this year.

19     Q. Do you know now?

20     A. No. I do not know now.

21       MR. COLANGELO-BRYAN: David, could we
22 put up Exhibit 2 again, please.

23       MR. ESPER: Counsel, I think this is a
24 good time. I think I need a little break before

Page 80

1 you go to the exhibit.

2       MR. COLANGELO-BRYAN: Fine.

3       MR. ESPER: Let's take five minutes.

4       (A recess was taken.)

5 BY MR. COLANGELO-BRYAN:

6     Q. Ms. Shukla, you said earlier that the
7 binder in front of you has the documents that HAF
8 produced to defendants in this case; right?

9     A. Yes.

10     Q. Does it have anything else?

11     A. It had the Complaint (indicating), and
12 tabs so that I can keep the submissions straight,
13 and a few handwritten notes in terms of totals
14 and things like that.

15       MR. COLANGELO-BRYAN: We ask for the
16 production of the handwritten notes.

17       THE WITNESS: Okay.

18       MR. ESPER: If they're just totals and
19 were written by the witness, which I believe they
20 are, I will be happy to do that.

21       MR. COLANGELO-BRYAN: David, could you
22 show the witness Exhibit 2, please.

23 BY MR. COLANGELO-BRYAN:

24     Q. Ms. Shukla, does this still look

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 81

1  familiar to you?
2      A.  Yes.
3      Q.  These are HAF's responses to
4  defendants' interrogatories; right?
5      A.  Yes.
6      MR. COLANGELO-BRYAN:  David, could we
7  go to the bottom of Page 17, please.
8  BY MR. COLANGELO-BRYAN:
9      Q.  Ms. Shukla, do you see in
10 Paragraph (b), starting with the second sentence,
11 where it says "Responding Party claims that, as a
12 result of the Defamatory Statements, it lost
13 potential donations and/or financial
14 contributions from 668 prospective new donors
15 obtained by Responding Party during the time
16 period from January 1st, 2021 to April 2nd,
17 2021"?
18     A.  Yes.
19     Q.  Could you explain what HAF means by the
20 word "obtained" in this passage?
21     A.  Sure.  We will meet prospective donors
22 at events or cull them from LinkedIn.  These are
23 people that we identify as potentially interested
24 in the work of HAF.  They might be people who

Page 82

1  have never donated to HAF but signed up to be on
2  our mailing list.
3      Q.  When you say they might have been
4  people who never donated, are some of these
5  prospective new donors people who actually have
6  donated previously?
7      A.  No.  No.  They are all new donors.
8      Q.  How does HAF know that it lost exactly
9  668 of these new donors?
10     A.  We know there are 668 new prospective
11 donors.  Whether it's through our CRM that
12 they're living in or through our mailing system,
13 Pardot, who have never donated but were added or
14 added themselves to our lists anywhere between
15 January 1st, 2021, and April 2nd, 2021.
16     Q.  Forgive me.  When you say "our CRM,"
17 what does that mean?
18     A.  Client relationship manager.
19 Salesforce.  What all these reports have been
20 generated from.
21     Q.  That's a software program, not a
22 person?
23     A.  Yes.  That is a software program.
24     Q.  That's a system that is used to track

Page 83

1  potential donors as well as actual donors?
2      A.  Yes.
3      Q.  When you said "Pardot," what does that
4  mean?
5      A.  Pardot is our emailing system that is
6  integrated with Salesforce.
7      Q.  What is that system used for besides
8  emailing, or could you be more specific?
9      A.  It is what our emails are sent out
10 through.
11     Q.  With respect to the 668 prospective
12 donors, do those individuals make commitments to
13 donate certain amounts to HAF?
14     A.  No.
15     Q.  Do they assume any manner of obligation
16 to donate a certain amount to HAF?
17     MR. ESPER:  Object as to form.
18     A.  No.  Anyone who volunteers to be added
19 to our list or is added to our list is considered
20 a potential donor.
21     Q.  Out of people who are added to the list
22 as potential donors, what percentage ultimately
23 actually make a contribution to HAF?
24     MR. ESPER:  Objection as to form.

Page 84

1      A.  I would have to go back to see what
2  those trends are.  I don't know personally.
3      Q.  Is there someone in HAF who tracks that
4  kind of thing in particular?
5      A.  Yes.  Our development team would.
6      Q.  If you look at Page 17 again, under
7  subheading (a), do you see where it says "An
8  amount to be determined at trial"?
9      A.  Yes.
10     Q.  So that means HAF is not able, at this
11 stage, to say what the damages would be from the
12 loss of the 668 prospective donors?
13     MR. ESPER:  Object as to form.
14     A.  Yes.  That is correct.
15     Q.  Do you personally know why these 668
16 individuals did not donate?
17     A.  I do not personally know.
18     Q.  Is there someone at HAF who you expect
19 would know that?
20     A.  No.
21     Q.  During the period referred to on
22 Page 17, between January 1st, 2021 and April 2nd,
23 2022, how many prospective donors, overall, did
24 HAF add to its list?

Deposition of Suhag A. Shukla                                    Hindu American Foundation v. Sunita Viswanath, et al.

Page 85

1    A.   I would have to check with our team.
2    Q.   Would you be able to approximate?
3    A.   That would be hard for me to do.
4    Q.   Is it correct to say that there is some
5  number of prospective donors separate from the
6  668 noted here who were put on HAF's list during
7  this time period and then later made
8  contributions to HAF?
9    A.   Again, I would have to check with the
10  development team, who is more aware of these
11  finer details.
12    Q.   Do you believe that every single
13  prospective donor added to the list during the
14  referenced period failed to make any donation
15  later?
16        MR. ESPER:  Object as to form.
17    A.   Could you repeat that question?
18    Q.   Is it your understanding that every
19  single prospective donor added to HAF's list
20  during the referenced time frame later failed to
21  make any donation to HAF?
22    A.   I don't know.
23    Q.   Is it correct that after defendants'
24  statements were made HAF received approximately

Page 86

1  $370,000 in donations who had never contributed
2  to HAF before?
3    A.   Yes.
4    Q.   Would some of those people have been
5  entered into HAF's system as prospective donors;
6  do you believe?
7        MR. ESPER:  Object as to form.
8    A.   It's possible.
9    Q.   What is your understanding as to why
10  HAF did not receive contributions from these 668
11  prospective donors but gained $370,000 in
12  contributions from new donors all after
13  defendants' statements were made?
14    A.   Could you repeat that question?
15    Q.   Do you have a personal understanding,
16  as HAF's executive director, of how HAF lost 668
17  prospective donors and also gained $370,000 from
18  new donors all following the time defendants'
19  statements were made?
20    A.   Yes.
21    Q.   What is your understanding?
22    A.   Of the $378,000 that came in from
23  first-time donors?
24    Q.   Sure.

Page 87

1    A.   Some of that, if I recall, did come in
2  response to appeals that we made after your
3  clients, the defendants, made their defamatory
4  statements, that we were going to fight against
5  these untruths.  So some did donate in response
6  to e-appeals that were sent out.  We also had a
7  very active year in terms of other activities
8  that advanced our mission.  So they may have
9  donated for those other reasons.
10    Q.   So there were donors who contributed
11  because of defendants' statements and HAF's
12  reaction to those statements?
13        MR. ESPER:  Object as to form.
14    A.   They donated to support us to fight
15  against defendants' defamatory statements.
16    Q.   Those donors were well aware of
17  defendants' statements, I take it?
18        MR. ESPER:  Object as to form.
19    A.   Yes.  They must have been aware,
20  because we were fighting against the defamatory
21  statements.
22    Q.   But your testimony is that those new
23  donors were aware of the statements; correct?
24        MR. ESPER:  Object as to form.

Page 88

1    A.   If they donated through an appeal in
2  which we announced that we would not take
3  defamation and libel lightly, yes, they would
4  have been aware.
5    Q.   Were those new donors aware of
6  defendants' statements when they made their
7  contributions?  "Yes" or "no."
8        MR. ESPER:  Object as to form.  That
9  calls for speculation.
10        Go ahead.
11    A.   I already answered that.
12    Q.   I am asking you to answer the question
13  I just asked.
14        MR. ESPER:  Same objection.
15    Q.   "Yes" or "no."
16    A.   But the answer is maybe.  I mean, so I
17  already answered that if they responded.
18    Q.   Well, I don't understand what you mean
19  by "maybe" when you said they contributed because
20  of what HAF was doing in response to the
21  defendants' statements.
22        MR. ESPER:  Counsel, is that a
23  question?
24    Q.   What do you mean when you say "maybe"

Page 121

1 both have presented on the third-party motion to
2 intervene.
3   Q.  Is your co-counsel's name Samir?  I'm
4 sorry.  It was a little difficult to hear.
5   A.  Yes.  Samir.  S-A-M-I-R, last name
6 K-A-L-R-A.
7   Q.  Did -- strike that.
8   What did Samir say about the defamation case
9 during that event?
10   A.  I don't recall.
11   Q.  Do you recall if he mentioned any of
12 the alleged defamatory statements?
13       MR. ESPER:  Object as to form.
14       Go ahead.
15   A.  He may have mentioned the basis of our
16 lawsuit and what is entailed in a defamation suit
17 and why we proceeded to sue in the context of the
18 statement.
19   Q.  When you say the basis of the lawsuit,
20 do you mean the alleged defamatory statements?
21   A.  Both the alleged defamatory statements,
22 as well as the interrelations and longstanding
23 relationships of your clients, the defendants,
24 and the coordinated manner in which they

Page 122

1 published and amplified defamatory statements
2 about HAF.
3   Q.  What did he say about what was entailed
4 in a defamation case?
5   A.  He -- I don't recall.
6   Q.  Did any of the defendants in this case
7 try to participate in -- strike that.
8   Did any of the defendants in this case seek
9 to attend virtually that event?
10   A.  Yes, they did.
11   Q.  And were they allowed to do that?
12   A.  No.  They were not.
13   Q.  Why not?
14   A.  Because your clients have a long track
15 record of defaming HAF and attacking HAF and
16 trying to undermine our credibility.  We have
17 every right to reject people from our events.
18       MR. COLANGELO-BRYAN:  Let's go off the
19 record, please.  Let's take five minutes and
20 we'll circle back and probably can transition
21 soon to the 30(b)(6).
22       (A recess was taken.)
23 BY MR. COLANGELO-BRYAN:
24   Q.  Do you recall your testimony about an

Page 123

1 event that potentially would have happened at
2 PayPal?
3       MR. ESPER:  Counsel, if we're going
4 back to this, we have to go Attorneys' Eyes Only.
5       MR. COLANGELO-BRYAN:  No, we don't.
6       MR. ESPER:  I mean, you know, that
7 wasn't -- I understand that was an accident.  I'm
8 not accusing you of anything.
9       MR. COLANGELO-BRYAN:  But the
10 questions -- the questions I would ask could not
11 conceivably be responded to with information that
12 you're contending is Attorneys' Eyes Only
13 information.
14       MR. ESPER:  Counsel, you just mentioned
15 a corporation's name in your question.  That's
16 part of the concern.
17       I know you didn't mean to --
18       MR. COLANGELO-BRYAN:  I will admit I
19 had forgotten that anyone was saying that name
20 was highly confidential.  I'll reframe.
21       MR. ESPER:  Okay.  Go ahead.
22 BY MR. COLANGELO-BRYAN:
23   Q.  Ms. Shukla, do you remember your
24 testimony previously --

Page 124

1       MR. ESPER:  Can we just stop for one
2 second.  Madam court reporter, that just at the
3 very beginning, where he does mention the name,
4 can we just mark that as Attorneys' Eyes Only.
5 Just a couple of lines in the transcript.  Thank
6 you.
7       Go ahead, Mr. Colangelo.
8 BY MR. COLANGELO-BRYAN:
9   Q.  Do you remember your testimony about a
10 Hinduism 101 presentation that HAF might have
11 given for a large company?
12   A.  Yes.
13   Q.  To whom at the company would that
14 presentation have been given?
15       MR. ESPER:  Object as to form.
16       Just, you know, stay away from
17 something that might be confidential or we'll
18 have to go Attorneys' Eyes Only again, but you
19 can answer generally.
20   A.  I believe members of their HR
21 department would have been invited.  Members of
22 DEI -- diversity, equity and inclusion -- staff
23 would have been invited, because our cultural
24 competency trainings include not only a broad

Page 125

1 overview of Hinduism but also how religion may
2 intersect with the law in the workplace.  So
3 accommodations.
4      Q.  So your understanding is that the
5 presentation would have been given to people from
6 HR and people who worked on diversity, equity and
7 inclusion issues?
8      A.  My understanding is that they would
9 have been amongst others that would have been
10 invited, including people that might be
11 interested in learning about Hinduism.
12      Q.  Would that have included employee
13 resource groups?
14      A.  Yes.
15      Q.  Can you think of any other broad
16 categories of people who would have been included
17 in that event?
18      A.  No.
19      Q.  You testified previously about a
20 specific employee at this company who provided
21 you information about the potential event.
22      Was it that same person who gave you the
23 information you have about the potential audience
24 at the company for the potential event?

Page 126

1      A.  Yes.  I believe so.
2      Q.  Was there some other source of
3 information on which you based the answer about
4 who might attend the event?
5      MR. ESPER:  You may answer that "yes"
6 or "no."
7      A.  No.
8      Q.  Is there any third party paying any
9 portion of HAF's legal fees in this defamation
10 case?
11      MR. ESPER:  Instruct not to answer.
12 Outside the scope and privileged.
13      MR. COLANGELO-BRYAN:  Okay.  So your
14 position, Mr. Esper, is that the answer to the
15 question of whether a third party is paying any
16 fees is privileged because it reflects
17 attorney-client communication?
18      MR. ESPER:  It might.  The general area
19 might.  And also it is outside the scope, as
20 framed.
21      Now, to be clear, I will allow you to
22 and will continue to allow you to examine as to,
23 you know, the issue of people who were donating
24 to the legal fund, you know.  And in a sense,

Page 127

1 that gets at possible third-party payments.
2      So it's not that I'm saying the entire
3 zone of third-party payment.  But outside of the
4 issues that go to the amount in controversy, you
5 know, who's paying their legal fees is outside
6 the scope of this deposition.
7      MR. COLANGELO-BRYAN:  Okay.  I need to
8 clarify.  Are you directing the witness not to
9 answer this question at all on the basis of
10 attorney-client privilege?
11      MR. ESPER:  And on the basis of outside
12 the scope of the deposition, but without
13 prejudice for you asking narrower questions that
14 might not call for such information.  It's this
15 specific question that I'm instructing on, not
16 the entire area.
17      MR. COLANGELO-BRYAN:  Is part of the
18 reason for your instruction attorney-client
19 privilege?
20      MR. ESPER:  I just said what the reason
21 was.  I shall clarify no more on the record.  We
22 can meet and confer later, if you want to.
23      MR. COLANGELO-BRYAN:  There's no reason
24 not to do it now.  Briefly.  I need to understand

Page 128

1 if your objection is based -- I'm sorry, if your
2 direction to the witness is based, in part, on an
3 assertion of attorney-client privilege.
4      MR. ESPER:  Read the record.  It's
5 already clear on that.  I answered that.
6      MR. COLANGELO-BRYAN:  Okay.  I take it
7 that the answer is "yes."
8      MR. ESPER:  The answer is already on
9 the record.
10      MR. COLANGELO-BRYAN:  Stop
11 interrupting.
12      MR. ESPER:  Well, don't say things,
13 don't put words into my mouth, Counsel.  Say what
14 you think --
15      MR. COLANGELO-BRYAN:  If I have -- my
16 understanding is that you are directing the
17 witness not to answer in part because of
18 attorney-client privilege.  If my understanding
19 is wrong, you should correct me right now.
20      MR. ESPER:  Your understanding is a
21 pathetic attempt to try and get me to say more
22 than I've already said.
23      The record is clear as to what my
24 objection is and the grounds.  I reject any