# EXHIBIT C

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3                              No. 1:21-cv-01268

 4   ---------------------------------------x

 5   HINDU AMERICAN FOUNDATION,

 6                Plaintiff

 7   vs.

 8   SUNITA VISWANATH; RAJU RAJAGOPAL;

 9   RASHEED AHMED; JOHN PRABHUDOSS;

10   AUDREY TRUSCHKE; AND DOES 1-20,

11                Defendants

12   ---------------------------------------x

13   REMOTE RULE 30(b)(6) DEPOSITION OF HINDU AMERICAN

14       FOUNDATION, BY AND THROUGH SUHAG SHUKLA

15            Monday, May 16, 2022 1:47 p.m.

16                 Conducted Virtually

17

18

19

20   Reported by:

21   Janet McHugh, RMR, CRR, CLR

22   JOB NO. 12858

23

24
```

May 16, 2022

1:47 p.m.

Remote Rule 30(b)(6) deposition of HINDU AMERICAN FOUNDATION, BY AND THROUGH SUHAG SHUKLA, conducted virtually, pursuant to Agreement before Janet McHugh, a Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and a Notary Public within and for the Commonwealth of Massachusetts.

```
 1   REMOTE APPEARANCES:
 2   Attorneys for the Plaintiff:
 3   Dilan Esper, Esquire
 4   HARDER LLP
 5   8383 Wilshire Boulevard, Suite 526
 6   Beverly Hills, California 90211
 7   424.203.1600
 8   desper@harderllp.com
 9
10
11   Attorneys for Defendant, Rasheed Ahmed:
12   Joshua Colangelo-Bryan, Esquire
13   Daniel Goldberger, Esquire
14   Florence Neale, Esquire
15   DORSEY & WHITNEY LLP
16   51 West 52nd Street
17   New York, New York 10019
18   212.415.9234
19   colangelo.joshua@dorsey.com
20   goldberger.dan@dorsey.com
21   neale.flossie@dorsey.com
22
23   - and -
24   - Continued-
```

```
 1   REMOTE APPEARANCES:  (Continued)
 2   Briana Al Taqatqa, Esquire
 3   DORSEY & WHITNEY LLP
 4   50 South Sixth Street, Suite 1500
 5   Minneapolis, Minnesota 55402
 6   612.340.2600
 7   altaqatqa.briana@dorsey.com
 8
 9
10   Attorneys for Defendants Sunita Viswanath and Raju
11   Rajagopal:
12   Thomas B. Sullivan, Esquire
13   Jacquelyn N. Schell, Esquire
14   BALLARD SPAHR LLP
15   1675 Broadway, 19th Floor
16   New York, New York 10019
17   212.223.0200
18   sullivant@ballardspahr.com
19   schellj@ballardspahr.com
20
21
22   Attorneys for Defendant Audrey Truschke:
23   Eric J. Feder, Esquire
24   DAVIS WRIGHT TREMAINE LLP
```

```
 1   REMOTE APPEARANCES:  (Continued)

 2   DAVIS WRIGHT TREMAINE LLP (Continued)

 3   1301 K Street NW

 4   Suite 500 East

 5   Washington, D.C. 20005-3317

 6   202.973.4200

 7   ericfeder@dwt.com

 8         - and -

 9   Jared Carter, Esquire

10   Cornell Law School First Amendment Clinic

11   Cornell University

12   Myron Taylor Hall

13   Ithaca, New York 14853-4901

14   207.319.6050

15   jc2537@cornell.edu

16

17

18   Attorneys for Defendant John Prabhudoss:

19   Daniel M. Sullivan, Esquire

20   Andrew W. Chang, Esquire

21   HOLWELL SHUSTER & GOLDBERG, LLP

22   425 Lexington Avenue

23   New York, New York 10017

24   646.837.5151
```

```
 1   REMOTE APPERANCES:  (Continued)
 2   HOLWELL SHUSTER & GOLDBERG, LLP (Continued)
 3   dsullivan@hsgllp.com
 4   achang@hsgllp.com
 5
 6   ALSO PRESENT:
 7   Audrey Truschke
 8   Rasheed Ahmed
 9   David Ambrogi, Everest Technician
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                      I N D E X

 2   WITNESS          DIRECT    CROSS    REDIRECT

 3   SUHAG SHUKLA

 4   By Ms. Neale       10

 5

 6                    E X H I B I T S

 7   Number           Description                     Page

 8   Exhibit 10   Document Bates-stamped

 9                HAF000058 through - 0088            122

10   Exhibit 13   Document Bates-stamped

11                HAF000341 through -0342             105

12   Exhibit 15   Document Bates-stamped

13                HAF000343                           107

14   Exhibit 17   Document Bates-stamped

15                HAF000344                           108

16   Exhibit 18   Document Bates-stamped

17                HAF000345                           111

18   Exhibit 19   Document Bates-stamped

19                HAF000346 through -0349             110

20   Exhibit 20   Document Bates-stamped

21                HAF000419 and -0420                 115

22   Exhibit 21   Document Bates-stamped

23                HAF000350                           112

24                   - Continued -
```

```
 1                    E X H I B I T S
 2    Number            Description                    Page
 3    Exhibit 22  Hindu American Foundation's
 4                Objections to Defendants'
 5                Notice of Deposition of
 6                Hindu American Foundation      10
 7    Exhibit 23  Document Bates-stamped
 8                HAF000040                      42
 9    Exhibit 24  Declaration of Eric W. Rose    50
10    Exhibit 25  Document Bates-stamped
11                HAF000400 through -0402        113
12    Exhibit 26  Document Bates-stamped
13                HAF000412 through -0414        114
14    Exhibit 27  Document Bates-stamped
15                HAF000089 through -0328        124
16
17              PREVIOUSLY MARKED EXHIBITS
18    Number                                     Page
19    Exhibit 1                                  19
20    Exhibit 2                                  29
21    Exhibit 3                                  14
22    Exhibit 7                                  109
23    Exhibit 8                                  32
24    Exhibit 9                                  26
```

PREVIOUSLY MARKED EXHIBITS (Continued)

| Number | Page |
|---|---|
| Exhibit 12 | 14 |
| Exhibit 14 | 17 |
| Exhibit 16 | 18 |

Page 14

Q. All right.
    MS. NEALE: David, can you please pull up Exhibit 3.
        (Previously marked Exhibit 3 incorporated by reference.)
BY MS. NEALE:
Q. So, Ms. Shukla, we reviewed this document in your individual deposition this morning. But just confirming, this is the rejection email from Allstate to HAF's pre-application for a grant; correct?
A. Yes.
Q. Does HAF know whether Allstate was aware of the defendants' statements?
A. No.
Q. Did anyone at HAF speak to anyone at Allstate about the statements?
A. No.
    MS. NEALE: Can you please turn to Exhibit 12, David.
        (Previously marked Exhibit 12 incorporated by reference.)
BY MS. NEALE:
Q. So, again, we looked at this earlier

Page 15

today as well, Ms. Shukla, but just confirming this is an email that was sent out to HAF's database of approximately 20,000 individuals; correct?
A. Correct.
Q. Did HAF -- HAF, I'm sorry, H-A-F. Did HAF do anything to prevent a recipient of this email from forwarding it to somebody else?
A. I don't believe so.
Q. Is there anyone at HAF that would know more specifically about whether HAF did anything to prohibit the forwarding of this email?
A. Yes. Our director of development.
Q. Director of development. Did you speak with them in preparation for this deposition?
A. I did.
Q. Did you ask them anything about email forwarding?
A. To the best of my recollection, I do not know whether we've ever had any mechanism to prevent email forwarding. But I'm not 100 percent certain whether it's something that could have been added on to our emailing system.
Q. And you didn't speak with the director

Page 16

of development about whether that was a feature that was added to emails; correct?
A. Right. It's the first time hearing of it right now during this deposition.
Q. Who prepares these emails at HAF?
A. Our marketing team.
    MS. NEALE: Can you scroll down a little bit, David, so that we can see -- I believe it's at the bottom of the next page.
    A little bit further, please. There. Right there. Thank you. So we can see that link.
BY MS. NEALE:
Q. Ms. Shukla, what format is that link in this email?
A. I would have to go back to the original email to see whether that is just a PNG image and whether it's a clickable link. I don't know. And then also where it clicks to. I don't recall.
Q. So in preparation for this deposition, you didn't look at the original email for this email? You just -- and you didn't pull up the original?

Page 17

    MR. ESPER: Objection. Ambiguous.
    MS. NEALE: Yeah. Let me rephrase.
Q. In preparation for this deposition, did you review the original email of this email that we're looking at here?
    MR. ESPER: Same objection.
    Go ahead.
A. I did review the original email. However, I don't recall clicking on all of the links in the email or, in particular, this image.
    MS. NEALE: David, can you please go to Exhibit 14.
        (Previously marked Exhibit 14 incorporated by reference.)
BY MS. NEALE:
Q. So, again, this email is another one we discussed earlier today, Ms. Shukla, but just to confirm, was this email also sent out to the entire HAF database of approximately 20,000 individuals?
    MR. ESPER: Objection. Asked and answered, but...
A. I believe so. I would have to confirm with our team.

Page 22

1  A. Yes. That if there is an account ID
2  living in either Salesforce or Pardot, that means
3  that they have acceded to being added to our
4  databases or volunteered themselves by entering
5  in their name and contact information. And they
6  would get frequent communications from HAF.
7  Q. So is this similar to a person signing
8  up for an email list with HAF?
9  A. Exactly.
10 Q. So they would receive emails with
11 information about HAF events and various things
12 as well?
13 A. Yes.
14 Q. Who is in charge of the systems to
15 track donations?
16 A. Our development team as well as our
17 marketing team.
18 Q. Is there a particular person on each of
19 those teams that is in charge of those teams?
20 A. It depends. We have our director of
21 philanthropic partnerships generally looks at the
22 donor circle data more closely and the rest,
23 which would be referred to as mass, mass
24 donations, would be our managing director and

Page 23

1  director of development.
2  Q. HAF tracks the donators who donate
3  every year; correct?
4  A. We -- yes.
5  Q. How does it track them?
6  A. Through Salesforce.
7  Q. Is there a separate database for donors
8  that donate every year or are they part of a
9  general database of all donors?
10 A. Everything is in Salesforce.
11 Q. So just one system?
12 A. (Witness nodded.)
13 Q. Does HAF produce reports to track its
14 donors?
15 A. During our annual board meetings, we
16 submit or present donor trends and financials to
17 our board of directors. And from time to time to
18 track our success, in order to determine how many
19 e-appeals need to go out in order to meet our
20 benchmarks or what goals we might need to set for
21 particular events -- over the past two years
22 they've been virtual, but previously for
23 in-person events -- we would look to donor
24 trends.

Page 24

1  Q. Does HAF produce reports ever
2  specifically for donors who donate every single
3  year?
4  A. Individualized reports? Is that what
5  you're asking?
6  Q. Let me rephrase that. Does HAF ever
7  produce a single report that shows all donors who
8  donate every single year?
9  A. No.
10 Q. Is the -- there a capability to do that
11 within the system?
12 A. Yes. I believe so.
13 Q. So HAF could produce a report of all
14 donors who donate every single year?
15 A. There are limitations to the system in
16 terms of how many years back that would be
17 allowed, but it's not a number necessarily
18 that -- or a trend that we track in the way that
19 we might with ceased or reduced.
20    MS. NEALE: We request production of a
21 report showing HAF donors who have donated every
22 single year as far back as possible within the
23 system.
24

Page 25

1  BY MS. NEALE:
2  Q. You testified before that HAF does not
3  have any system to track the reasons behind why a
4  donor donates or doesn't donate in a particular
5  year; correct?
6  A. Not a system, but a policy, yes.
7  Correct.
8  Q. Can you say that again. Sorry?
9  A. It's more of a policy or a practice, as
10 opposed to a system. If that's what you mean.
11 Q. Right. So HAF has a policy or practice
12 that it doesn't track the reasons why a donor may
13 donate in one year and not the next year;
14 correct?
15 A. Right.
16 Q. And similar to that, you testified
17 before that HAF, as a policy, does not ask donors
18 their reasons behind why they donate or why they
19 don't donate in a particular year; correct?
20 A. There's two answers to this. We may
21 learn from a donor why they've donated, but we do
22 not ask why someone has not donated or reduced
23 their donations.
24 Q. So a donor may volunteer information as

Page 38

1  53.40?
2      A.   Yes.
3      Q.   So is that number the difference
4  between the 2021 and the 2020 number?
5      A.   So okay.  I need to clarify --
6      Q.   Okay.
7      A.   -- the response to this.  So the 12,000
8  is just a sum total of donations from donors who
9  reduced their donation in 2021, but donated a
10 particular amount in 2022.  So I believe that
11 that 12,000 number at the very bottom is just a
12 sum total.  The difference, I do not believe, has
13 been calculated as of yet, between 2021 and 2022.
14     So if you take the sum total of the
15 reductions, this is an offset to the reductions,
16 presuming that the reduction -- that number would
17 have been constant, meaning that they would
18 donate the same thing from 2021 and 2022.
19     Q.   So that --
20     A.   We -- go on.
21     Q.   No.  You go ahead.
22     A.   I don't believe that the full -- to the
23 best of my recollection, because I've been
24 looking at a lot of numbers, on the 2022, I don't

Page 39

1  believe that that 12,000 is a calculated full
2  difference, because as I'm looking at 2022,
3  there's still a reduction, say, in Line 5 --
4  actually, 4.  That line you pointed out with the
5  53.40, in 2021, that donor decreased their
6  donation from 355 to 276.70 and then decreased it
7  even further to 53.40.
8      Q.   Right.
9      A.   So I believe that the bottom number is
10 just a sum total of the donations that have come
11 in without any further calculation as to whether
12 it's a reduction from between 2021 and 2022 or an
13 increase.
14     Q.   So was that number, that $12,000
15 number, used to offset the reduced donations in
16 the -- from the 2021 to 2020?
17         MR. ESPER:  Objection as to the form.
18     A.   I would have to look back at the
19 pleadings to see what the sum totals are.
20         MS. NEALE:  All right.  Let's go to
21 Exhibit 2.
22     Can you scroll to Page 13, please.  Can
23 you scroll down to where it says "Reduced
24 donations" and have that at the top.

Page 40

1  BY MS. NEALE:
2      Q.   All right.  Do you see where it says
3  "Reduced donations," Ms. Shukla?
4      A.   Yes.
5      Q.   And do you see Section (c) under that
6  heading says that HAF suffered $84,991 in reduced
7  donations in 2021; correct?
8      A.   Correct.
9      Q.   So what is that number?  Where did that
10 come from?
11     A.   That is the sum total of the reductions
12 of donations from 2020 to 2021.
13     Q.   Then a little further down the line
14 there's that number where it says HAF has
15 suffered $72,632.90 in reduced donations in 2022;
16 is that correct?
17     A.   Yes.  That's correct.
18     Q.   So where did that number come from?
19     A.   As I'm looking at this, my
20 understanding is that this is based -- because
21 the year is not complete yet, it's based on the
22 presumption that the reductions would carry over
23 from 2021, that those donors who reduced would
24 continue to donate if they were to donate at that

Page 41

1  reduced amount, and then it's been offset by the
2  number of donations that came in without looking
3  necessarily at the individual line items as to
4  whether someone continued to reduce.
5      So that's a calculation that, you know, this
6  is based on what is presently known.  But we'll
7  have to wait for the remainder of the year to do
8  the total calculations in the way that 2021
9  losses were.
10     Q.   So I just want to walk through and make
11 sure I completely understand.
12     So in reaching this $72,632.90 figure, HAF
13 assumed that all of the donors that reduced their
14 donations in 2021 would reduce them by the same
15 amount in 2022?
16     A.   That they would stay at that same
17 reduced amount.  So it's where their giving level
18 was in 2020, prior to the defamation, reduced in
19 2021, and they remain at that reduced level after
20 the defamation.
21     Q.   All right.  And then based on that
22 assumption, HAF added back in that 12,000 figure
23 that we were just talking about from the report
24 to offset donations that it had received from

Page 42

those same donors; is that correct?
   A.  Correct.
   Q.  And is that how this 72,632 figure was reached?
   A.  Yes.
   Q.  So the donors that were included in this figure were the donors that had donated in 2020, reduced their donation in 2021, and then the donors that gave a little bit in 2022 and then the rest assuming that it's the same level as 2021?  Is that correct?
      MR. ESPER:  Object as to form.
      Go ahead.
   A.  Yes.  That's correct.
   Q.  And who calculated this number, the 72,632 figure?
   A.  Our director of philanthropic partnerships.
   Q.  All right.
      MS. NEALE:  David, can you please pull up Exhibit 23.
      (Document Bates-stamped HAF000040 marked Exhibit 23.)

Page 43

BY MS. NEALE:
   Q.  Ms. Shukla, do you recognize this document?
   A.  I do.
   Q.  What is this document?
   A.  This is a listing of family foundations that we reached out to with solicitations for donations and partnership, with the first column reflecting each of these family foundations' average gift in 2019.
   Q.  What does HAF mean by the phrase "family foundations"?
   A.  Family foundations are charitable -- charitable trusts that have been set up by individual families.  Many of them will set aside monies that they provide to nonprofits for charitable purposes.
   Q.  Does HAF solicit donations from family foundations?
   A.  Yes.  This was a solicitation to family foundations.
   Q.  How did HAF contact the family foundations to solicit donations in 2019?
   A.  In 2019 -- in --

Page 44

      MR. ESPER:  Object as to form.
   A.  So the calculations on this are 2019.  However, outreach occurred in 2021.  The information on the average gift is calculated from publicly available statistics on guidestar.org, which is a charitable watchdog platform.  So that's where those numbers came from, just for additional information on the question.
      And our outreach occurred in, I believe, May or June of 2021.  And it included both a physical mailer as well as a QR code that donors or the family foundation designees or the, you know, person in charge could scan, and that would take them to a landing page that would provide them greater in-depth material about HAF's work in education, civil rights and human rights.
   Q.  So the numbers that are on this document that we're looking at here, these weren't donations given to HAF in 2019?
   A.  No.  They were not.  These are donations that these foundations have provided to similar -- similar organizations, some not similar.  But this is a range of their average

Page 45

gifts.
   Q.  So HAF did not solicit funding from family foundations in 2019?
   A.  No.  We did not.
   Q.  Did HAF solicit funding from family foundations in 2020?
   A.  No.
   Q.  So HAF only solicited funding from family foundations in 2021; correct?
   A.  Yes.
   Q.  Has HAF solicited donations from family foundations in 2022?
   A.  Yes, we have.
   Q.  All right.  Going back to 2021, how many foundations did HAF solicit donations from?
   A.  Thirty.
   Q.  Can you say that again.  Sorry.
   A.  Thirty.
   Q.  Thirty.  Okay.
      And it was direct mailer, you said?
   A.  It was a direct mailer that had a QR code that needed to be scanned, which would take them to a special landing page, where there was additional information and a contact for them to

Page 46

1  reach out to, because family foundations usually
2  require, you know, one-on-one conversations. And
3  we had, I believe, 90 clicks or 90 visits to that
4  page from these mailers.
5      Q.  Did HAF receive any funding from any
6  family foundations in 2021?
7      A.  No, we did not.
8      Q.  And then in -- you said that HAF has
9  solicited donations from family foundations in
10 2022; correct?
11     A.  Correct.
12     Q.  Has HAF used the same process of using
13 a direct mailer to solicit these donations?
14     A.  This was at least the one family
15 foundation that I have direct knowledge of was
16 through an introduction.
17     Q.  Can you explain what you mean by that?
18     A.  A board member met with the designee of
19 a family foundation. And the -- that individual,
20 the designee of the family foundation, relayed to
21 our board member to encourage staff to submit
22 a -- to reach out and submit a proposal.
23     Q.  Has HAF received any funding from the
24 solicitation in 2022?

Page 47

1      A.  We're still waiting for a decision.
2      Q.  Did HAF do anything else to solicit
3  donations from family foundations in 2022?
4      A.  No. I don't believe so. Whether
5  there's been personal outreach, I would have to
6  check with my director of philanthropic
7  partnerships.
8      Q.  Did HAF do anything to target the
9  specific family foundations that it did reach out
10 to solicit donations from in 2021?
11         MR. ESPER:  Object as to form.
12     A.  Yes. They were selected after a deep
13 study of their giving histories, as to what sorts
14 of causes they were providing donations to.
15 Those that were focused on education or cultural
16 proficiency or human rights were the ones that we
17 targeted.
18     Q.  Prior to the solicitation by HAF to any
19 of these family foundations, did HAF have a
20 relationship with any of them, preexisting that
21 solicitation in 2021?
22         MR. ESPER:  Objection as to form.
23     A.  I do not believe so.
24     Q.  How much did HAF request in donations

Page 48

1  from each foundation?
2      A.  These requests did not submit a
3  proposal. Usually, the process is that you reach
4  out to a family foundation. They respond
5  affirmatively to say they're interested in
6  learning more, or they will invite a proposal or
7  request a proposal be drafted and submitted.
8      Q.  And did any of these family foundations
9  request a proposal to be submitted from HAF in
10 2021?
11     A.  No. They did not.
12     Q.  Did any of them include a statement as
13 to why they wouldn't -- they didn't want to move
14 on to that request from HAF in 2021?
15     A.  No. They did not.
16     Q.  Were any of these foundations that HAF
17 solicited donations from in 2021 aware of the
18 defendants' statements?
19         MR. ESPER:  Object as to form.
20     A.  I have no way of knowing.
21     Q.  Is there anyone at HAF that would know
22 that?
23     A.  No. These were new prospective donor
24 relationships that we were making an effort to

Page 49

1  build. And similar to our policy with existing
2  donors, we do not ask why someone has not
3  responded or reduced.
4      Q.  And you said earlier that HAF is in the
5  process of soliciting donations from a family
6  foundation in 2022; correct?
7      A.  Correct.
8      Q.  So at this point, it's possible that
9  HAF could receive a donation from this family
10 foundation; correct?
11     A.  Correct.
12         MS. NEALE:  All right. David, you can
13 close out of this exhibit.
14 BY MS. NEALE:
15     Q.  Who is Eric Rose?
16     A.  Eric Rose is a reputation media
17 marketing expert.
18     Q.  How did HAF learn about Eric Rose?
19         MR. ESPER:  If you can answer without
20 revealing any privileged communications with your
21 lawyers, you can answer. Otherwise, caution.
22     A.  We learned about them -- we learned
23 about him from our lawyers.
24     Q.  When did Eric Rose first start

Page 50

1 communicating with HAF?
2     MR. ESPER: Object as to form.
3     Obviously, exclude communications
4 between Eric Rose and us. But if he communicated
5 directly with HAF, you can answer.
6     A. We have never communicated directly
7 with Eric Rose.
8     Q. What work did -- strike that. I'm
9 going to start over.
10    Did HAF provide Eric any materials to help
11 with his analysis?
12    A. No. We did not.
13    Q. Has HAF used Eric's services before
14 this lawsuit?
15    A. No. We have not.
16    Q. Did HAF pay Eric anything for his
17 services?
18    A. Through our law firm, yes.
19    Q. How much did HAF pay Eric through your
20 law firm?
21    A. I believe it was 8- to $10,000.
22    MS. NEALE: All right. David, can you
23 please pull up Exhibit 24.
24       (Declaration of Eric W. Rose

Page 51

1 marked Exhibit 24.)
2     MS. NEALE: Ms. Shukla, let me know if
3 you need a break at any point as well.
4     MR. ESPER: It's actually a good time
5 for a break.
6     MS. NEALE: All right.
7     THE WITNESS: Okay.
8     MS. NEALE: All right. Let's take a
9 five-minute break. Does that sound all right?
10    MR. ESPER: I believe probably around
11 seven minutes, but yeah.
12    MS. NEALE: Okay. Sounds good.
13       (A recess was taken.)
14 BY MS. NEALE:
15    Q. Before we move on to the next exhibit,
16 I wanted to ask you, Ms. Shukla, just one more
17 question about the family foundations that we
18 were just discussing.
19    You mentioned that HAF in 2021 solicited
20 donations from 30 family foundations; is that
21 correct?
22    A. Yes.
23    Q. What were those family foundations?
24    A. Meaning the nature of the family

Page 52
CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 foundations?
2     Q. The names of them.
3     MR. ESPER: Counsel, can we go off the
4 record for a moment?
5     MS. NEALE: Sure. Let's go off the
6 record.
7        (A recess was taken.)
8     MR. ESPER: All right. We're back and
9 we'd like to go back on the record.
10    MS. NEALE: All right. Let's go back
11 on the record. And we object to counsel
12 conferring with the witness while a question is
13 pending.
14    MR. ESPER: Well, you'll see why I had
15 to in a moment. This next section has to be
16 Attorneys' Eyes -- designated Attorneys' Eyes
17 Only. This is -- the identities of these
18 organizations are sensitive. There may be
19 attempts in the future to get them -- to seek
20 donations from them as well. So this has to be
21 Attorneys' Eyes Only.
22    So, once again, everybody who is not an
23 attorney needs to drop off the call before we go
24 forward on this.

Page 53
CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     MR. FEDER: Please give us a moment to
2 confirm that.
3     MS. NEALE: We object to designating
4 this portion of the deposition as Attorneys' Eyes
5 Only.
6     MR. ESPER: It's the procedure in the
7 protective order for seeking to challenge that
8 designation. But as of now, it's Attorneys' Eyes
9 Only.
10    MS. NEALE: Can we go off the record
11 for a minute, please.
12       (A recess was taken.)
13 BY MS. NEALE:
14    Q. All right. Ms. Shukla, do you need me
15 to restate the question?
16    A. Yes, please.
17    Q. So as you said earlier, testified
18 earlier, HAF solicited donations from 30 family
19 foundations in 2021. What were those family
20 foundations?
21    A. They are family foundations that we did
22 research, independent research from GuideStar,
23 looking up charities -- or family foundations
24 that have donated to Hindu causes to -- or may be

Page 54
CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 of Hindu origin and have donated to educational
2 efforts or cultural efforts. So that's how we
3 gleaned our list.
4    Q. Can you give me the names of the family
5 foundations that HAF solicited the donations from
6 in 2021?
7    A. I can't list off all 30 by memory. But
8 we have it available.
9    Q. When you say "available," do you mean a
10 physical document? Is there a person at HAF that
11 could testify as to who they are?
12    A. Yes. Our director of philanthropic
13 partnerships, who led this effort, would have
14 familiarity -- I mean, I have familiarity with
15 it, but I can't remember off of the top of my
16 head the names of any of them right now.
17    Q. But your director of philanthropic
18 operations -- is that the correct title?
19    A. Philanthropic partnerships.
20    Q. Philanthropic partnerships. Thank you.
21    -- they would know the names of all the
22 family foundations from 2021 --
23    A. Yes, they would.
24    Q. -- that HAF solicited?

Page 55
CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A. Yes.
2    Q. And then you mentioned earlier as well
3 that HAF has solicited donations from one family
4 foundation in 2022; is that correct?
5    A. Yes, it is.
6    Q. What is the name of that family
7 foundation?
8    A. That family foundation's name is Guru
9 Krupa Foundation. G-U-R-U K-R-U-P-A Foundation.
10        MS. NEALE: All right. I am finished
11 with this line of questioning now, so we can
12 bring the clients back in.
13        MR. ESPER: Okay. One thing I'll --
14 you know, I don't know exactly how you want to
15 proceed on that, but, you know, one possibility
16 is that we get a document together that lists all
17 the foundations, stamp it Attorneys' Eyes Only,
18 and turn it over to you, if that is something
19 you're interested in. I can --
20        MS. NEALE: Yeah. That would be --
21        MR. ESPER: -- if that's something you
22 would be interested in.
23        MS. NEALE: Yes. We request that
24 document, please.

Page 56
1        THE WITNESS: Can I just ask my
2 attorney a question?
3        MR. ESPER: Go off the record.
4        MS. NEALE: Yes. Let's go off the
5 record.
6        (A recess was taken.)
7 BY MS. NEALE:
8    Q. Going back to what we were discussing
9 earlier, Ms. Shukla, about Eric Rose, you
10 testified that no one at HAF spoke with Eric
11 about his analysis; correct?
12    A. That's correct.
13    Q. Did any of HAF's attorneys speak with
14 Eric about his analysis?
15        MR. ESPER: You can answer that "yes"
16 or "no" to the extent you know.
17    A. I want to -- I want to just clarify,
18 HAF has in-house attorneys. The answer to that
19 is "no." As far as our outside counsel
20 representing us in this defamation suit, I don't
21 know the nature of any conversations.
22    Q. So HAF's internal counsel did not
23 communicate with Eric Rose; correct?
24    A. That's correct.

Page 57
1    Q. But HAF's external or outside counsel
2 did communicate with Eric Rose; correct?
3        MR. ESPER: "Yes" or "no." And only to
4 the extent you know.
5    A. Yes, to the extent of hiring Eric Rose,
6 as a -- or getting his expert testimony or
7 report.
8    Q. All right.
9        MS. NEALE: David, can you please pull
10 up Exhibit 24.
11 BY MS. NEALE:
12    Q. Ms. Shukla, do you recognize this
13 document?
14    A. You'll have to scroll down just a
15 little bit more so that I can -- yes. The
16 declaration of Eric Rose.
17    Q. So what is this document?
18    A. This is the expert opinion from Eric
19 Rose on what would be required for us to repair
20 the reputational damage inflicted upon us by the
21 coordinated efforts of your clients, the
22 defendants, in defaming HAF and amplifying those
23 defamatory lies.
24        MS. NEALE: David, can you please go to

Page 58

Page 14. And then scroll to Paragraph 58, please. Thank you.
BY MS. NEALE:
    Q. Eric estimates that it will cost HAF $485,000 to mitigate the reputational harm; is that correct?
    A. Yes. That's correct.
    Q. How does he reach that figure?
        MR. ESPER: Object as to form.
        You can answer to the extent you know.
    A. From what I have read in this declaration, he estimated the cost, based on Google Searches, as to what articles or how frequently the defamatory lies and information were published, republished and amplified through various channels. And based on that, estimated the amount of services that we would be required to retain, including a PR reputation -- reputation management PR firm, an online reputation management specialist, as well as Google advertising in order to push down the false and defamatory lies published about us, because those will remain online in perpetuity.
    Q. And HAF did not provide him, Eric Rose,

Page 59

any materials for him to rely on to reach this number; is that correct?
    A. That is correct.
        MR. ESPER: Object as to form.
        THE WITNESS: Sorry.
        MR. ESPER: That's okay.
    Q. You mentioned that this figure includes ads to push down the articles at issue in this lawsuit; correct? Push them further on the Google Search; is that correct?
    A. That is my understanding. I'm not an expert in SEO or, you know, how these things work.
    Q. When Eric was doing his analysis, did he include HAF's own republication of the articles at issue in this lawsuit?
        MR. ESPER: Object as to form.
    A. I don't recall. Any republication or republication of the defamatory materials have always been in conjunction with the truth that HAF has published.
    Q. If we can look at Paragraph 59. Eric estimates that it will cost $60,000 a year to retain a reputation management/PR firm; is that

Page 60

correct?
    A. Yes, it is.
    Q. How does he reach that figure?
        MR. ESPER: Object as to form.
    A. I'm assuming that he has reached that amount based on his own experience as an individual working in reputation management.
    Q. Has HAF retained a PR firm in connection with defendants' statements?
    A. We have interviewed reputation firms but have not yet retained a reputation management firm. But the amount that Eric Rose has quoted is in the range that we've heard from reputation management experts.
    Q. How many firms has HAF interviewed with?
    A. At least one, if not two.
    Q. Has HAF retained a PR firm for any reason in the past?
    A. We have.
    Q. What for?
    A. We have had campaigns, educational campaigns, where we have retained a PR agency to help promote our narratives. And those have run

Page 61

on retainer about 25- to $30,000 a month.
    Q. How many times has HAF retained a PR firm in the past?
    A. At least twice.
    Q. Which PR firm did it -- has it retained in the past?
    A. It's a firm called "Bospar."
    Q. And you testified that in the past it has cost 25,000 to 30,000 a month to use this PR firm?
    A. Yes.
    Q. How many years has HAF retained the firm for in the past?
    A. We -- it's usually a monthly, with a commitment of at least three months. So I believe the last educational campaign that we retained Bospar for might have been a 3- or 4-month contract, and once that campaign was over, we didn't renew. Most recently, we hired them for an initial three months and continue to have their services, not related to this case.
    Q. So currently HAF has a retainer or contract with this PR firm but not related to this lawsuit; correct?

Page 62

1  A. Correct.
2  Q. How much has HAF paid this PR firm?
3  A. That same monthly rate, 25- to 30,000
4 per month.
5  Q. What documents does HAF have to reflect
6 these contracts with this PR firm?
7  A. We would have an agreement, a contract,
8 with the rates and the terms. But both times
9 that we've retained have not been related to this
10 lawsuit or to the defamatory statements.
11      MS. NEALE: We request production of
12 these past contracts.
13      MR. ESPER: That's going to take a
14 meet-and-confer. And I don't want to slow you up
15 in your deposition, but it's going to take a
16 meet-and-confer because I think it's outside the
17 scope. So, you know, if you point to something
18 that is within the scope of maybe -- I'm not,
19 like, completely closed to it. It's going to
20 take a meet-and-confer. You're going to have to
21 give me a call, but go ahead.
22 BY MS. NEALE:
23  Q. Now let's look at Paragraph 60. Here
24 Eric Rose estimates that a repair program would

Page 63

1 involve ORM specialists at $180,000 per year; is
2 that correct?
3  A. Yes.
4  Q. How does he reach that figure?
5      MR. ESPER: Object as to form.
6  A. I'm assuming that it's the standard
7 price for online reputation management
8 specialists.
9  Q. What ORMs did he speak to?
10      MR. ESPER: Object as to form.
11  A. I have no idea. I did not -- have not
12 spoken to Eric Rose.
13  Q. Has HAF retained ORM specialists?
14  A. I don't believe so.
15  Q. Who at HAF would know?
16  A. Our director of -- our director of
17 communications would know.
18      MS. NEALE: David, if we can go to the
19 next page, Paragraph 62, please.
20 BY MS. NEALE:
21  Q. So here Eric Rose estimates that HAF
22 should expect to spend $245,000 on advertising;
23 is that correct?
24  A. It is.

Page 64

1  Q. How did he reach that figure?
2      MR. ESPER: Object as to form.
3  A. Again, based on his expertise. I'm
4 assuming he has experience in the cost of
5 repairing a reputation through advertising and
6 based his numbers on that.
7  Q. How much has HAF spent on advertising
8 to respond to defendants' statements?
9  A. We have not expended any funds as of
10 yet on advertising to respond to the defamation.
11  Q. Has HAF hired an outside advertising
12 firm to assist with response to defendants'
13 statements?
14  A. No, we have not.
15  Q. Does HAF do advertising in-house?
16  A. We do some Google advertising. It's
17 more in relation to our education work.
18  Q. So HAF has not done any advertising
19 from in-house or an outside firm in relation to
20 defendants' statements; correct?
21  A. Correct.
22      MS. NEALE: All right. David, we can
23 close the exhibit. Thank you.
24

Page 65

1 BY MS. NEALE:
2  Q. Does HAF have officers that record
3 their time by the hour?
4  A. Officers, meaning staff members, or
5 what do you mean by "officers."
6  Q. Staff members and higher-level staff
7 and employees?
8  A. Generally, no. The only time that they
9 might track time is for our IRS purposes when
10 they're working specifically on legislation.
11  Q. So, for example, a staff member may
12 record their time by the hour if working on a
13 project like that that you just specified?
14  A. Yes.
15  Q. And a higher-level executive may also
16 record their time by the hour for IRS purposes
17 for that same reason?
18  A. Yes.
19  Q. How does HAF track an employee's hours?
20  A. We don't track hours. We have
21 benchmarks and either you achieve those
22 benchmarks or you don't.
23  Q. What do you mean by "benchmarks"?
24  A. What I mean by "benchmarks" are

Page 126

 1  basis?
 2     A.  Not directly.  We track trends, and
 3  like most nonprofits, have a definitive
 4  fundraising season, which is September onwards.
 5     Q.  You said HAF tracks trends?
 6     A.  Trends.
 7     Q.  Can you expand on that a little bit?
 8  How does that work?
 9     A.  It's a matter of looking to see what --
10  you know, what is coming in, just based on
11  different topics or specific programs.  We -- for
12  instance, you know, while January to September in
13  the nonprofit world is not considered fundraising
14  season, nonprofits still fundraise during those
15  times.  And so if we're running a campaign like
16  we did in March of 2021 to build awareness around
17  the genocide of Bengali Hindus in 1971, there
18  might be campaigns.  So those would be tracked to
19  see how they're doing, what sort of traction
20  they're getting, and then that goes towards the
21  annual goal.
22     And then the director of philanthropic
23  partnerships is, of course, having conversations
24  with donor circle members, not always about

Page 127

 1  donating, but some sort of communication to kind
 2  of ascertain whether we can count on their
 3  continued support for a particular year.
 4     Q.  You mentioned fundraising season.  Can
 5  you explain what that means and just kind of
 6  expand on that phrase?
 7     A.  Sure.  Most nonprofits, their
 8  fundraising season is probably November and
 9  December.  It's -- it coincides with the
10  holidays.  There's Giving Tuesday, after
11  Thanksgiving.  Most people, if they haven't
12  already made their contributions earlier in the
13  year, have a better idea because the deadline for
14  tax deductions, being able to take tax deductions
15  on charitable contributions is December 31st of
16  the year.  And so that's when you see kind of the
17  largest influx of donations.
18     Q.  You also mentioned that HAF tracks the
19  trends of donations that it's receiving, you
20  know, in connection with different campaigns.
21  Can you explain a little bit more what that
22  process of tracking those trends entails?
23     A.  It would be similar to what we
24  discussed with each of the appeals.  That

Page 128

 1  donations and click-throughs will be looked at.
 2  If there's organic donations that don't
 3  necessarily have a click-through, there's that
 4  24-hour period.  But if there's a click-through,
 5  it will still be attributed to the appeal because
 6  someone may not read their email on the day that
 7  it comes, but they click through and donate a
 8  couple of weeks later.  But there's still a
 9  mechanism to track it.  Or if someone verbally
10  articulates that "I'm sending a check in, and I
11  want it -- it's because I read your appeal about
12  your project on generating awareness on
13  genocide."
14     Q.  So turning back to Exhibit 27 here,
15  this document shows the donations for the full
16  years of 2019, 2020, and 2021; correct?
17     A.  Oh, the full years.
18     Q.  Mm-hmm.
19     A.  Yes.  From April to April.  Yes.
20     Q.  How much did HAF receive, in total, in
21  donations for 2019?
22     MR. ESPER:  Object as to form.
23     A.  2019, to the best of my recollection,
24  something like 1-point -- between 1.6 and 1.7

Page 129

 1  million.
 2     Q.  So according to this document, the
 3  total donations for 2019 were $1,638,040.50.
 4  Does that number sound correct to you?
 5     MR. ESPER:  Object as to form.
 6     A.  What was that number?
 7     Q.  $1,638,040.50.
 8     MR. ESPER:  Same objection.
 9     A.  That sounds about right.
10     Q.  How much did HAF receive in total in
11  donations for 2020?
12     A.  In 2020, I believe --
13     MR. ESPER:  Same objection, by the way.
14     A.  I believe it was somewhere between 1.5
15  and 1.6 million.
16     Q.  Based on this document, that number is
17  $1,577,784.73, as total donations for the year
18  2020.  Does that sound correct?
19     A.  Yes, it does.
20     Q.  How much did HAF receive in total in
21  donations in 2021?
22     MR. ESPER:  Same objection.
23     A.  In 2021, we received 2-point -- 2.4,
24  approximately.  2.4 million.  That includes one